Ryan B. Frazier (9007)
Jonathan M. Burt (16794)
**KIRTON | McCONKIE**
36 South State Street, Suite 1900
Salt Lake City, UT 84111
Telephone: 801-328-3600
Email: rfrazier@kmclaw.com
       jburt@kmclaw.com

*Attorneys for Plaintiff Wyatt Felt*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISON

| | |
|---|---|
| WYATT FELT,<br><br>    Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF UTAH,<br><br>    Defendant. | **COMPLAINT**<br>**AND**<br>**JURY DEMAND**<br><br>Civil Case No.: 2:24-cv-00063-DAO<br><br>Magistrate Judge: Daphne A. Oberg |

## <u>INTRODUCTION</u>

1.    This lawsuit asserts discrimination in employment claims under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, gender, religion, national origin).

2.    This lawsuit also asserts discrimination in employment claims in violation of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

3.     This Complaint relates to whether Defendant the University of Utah ("Defendant" or the "University"), through its agents, violated the United States Constitution and federal law by discriminating against Dr. Wyatt Felt ("Plaintiff" or Dr. Felt) on the basis of sex, race, national origin, and religion when the University refused to hire Dr. Felt as a professor in the University of Utah's Mechanical Engineering Department (the "ME Department").

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States, namely the Constitution, Title VII, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1983.

5.     Venue in this district is proper under 28 U.S.C. § 1391(b).

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

6.     The Plaintiff timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (the "EEOC") as EEOC Charge No. 35C-2019-00066.

7.     The EEOC issued a Notice of Right to Sue letter (the "Right to Sue") on or about October 24, 2023. A true and correct copy of the Right to Sue is attached hereto as Exhibit "A."

8.     The Plaintiff received the Right to Sue on October 26, 2023.

9.     This Complaint is timely as it is filed within 90 days of the Plaintiff's receipt of the Right to Sue.

10.     The Plaintiff has satisfied all administrative prerequisites necessary to file this lawsuit.

## PARTIES

11.     Plaintiff Dr. Wyatt Felt is a Utah resident and citizen.

12.     Defendant the University of Utah is an institution of higher education located and operating in Salt Lake City, Utah.

13.     Defendant is an "Employer" subject to Title VII of the Civil Rights Act of 1964.

14.     Defendant is a public institution under the authority of the Utah Legislature and is subject to the same restrictions imposed on the State by the Constitution of the State of Utah and the Constitution of the United States.

15.     All of the practices, acts, and failures to act alleged herein were duly performed by and are attributable to Defendant, acting by and through its agents and employees. Such practices, acts and failures to act were within the scope of any agency, office or employment, or were ratified by Defendant.

## GENERAL ALLEGATIONS

***Defendant's Discriminatory Policies***

16.     The University assures its online applicants that their voluntarily reported demographic information (i.e., race/ethnicity and gender) "will not be seen by individuals involved in the hiring process and is not used to determine eligibility for employment."

17.     However, emails obtained by the Plaintiff show that the University administration uses the protected information when deciding whether to approve candidates for on-campus interviews, cross-checking the department's perceived characteristics of the candidates with those that candidates self-report in their applications.

18.     Under the guise of increasing diversity, Defendant put in place an elaborate system for discriminating against applicants with Dr. Felt's protected characteristics.

19.     In doing so, Defendant limited, segregated, and classified its applicants for employment in a way which deprived the Plaintiff of an employment opportunity and tends to deprive other applicants that share the Plaintiff's race and sex of employment opportunities, because of such individual's race and sex.

*Dr. Watkins Seeks More Diversity Hires*

20.     At the time of Dr. Felt's application, Dr. Ruth Watkins, who would later serve as the University's President, was serving as the University's Senior Vice President of Academic Affairs (SVPAA) and oversaw faculty hiring.

21.     At the same time, Dr. Watkins served as the co-chair of a national "Faculty Diversity Task Force" of university administrators tasked with the "evaluation and revision of current faculty hiring practices."

22.     The Task Force's goal was to identify and implement "evidence-based practices"— or "interventions" by university administrators—to "[transform] institutional hiring practices" with the "core [of addressing] the components of faculty hiring to increase the percentage of STEM faculty from underrepresented groups."

23.     In other words, the goal of the national task force led by Dr. Watkins was, effectively, to decrease the percentage of faculty positions going to persons that shared Dr. Felt's gender, race, and other protected characteristics.

24.     Starting during her time as the University SVPAA, Dr. Watkins implemented similar initiatives at the University of Utah, as reflected, for example, in the "University of Utah Strategic Goals."

25.     Those goals included a charge to "[i]ncrease diversity of faculty, including women in science and engineering."

26.     As University President at a public meeting, Dr. Watkins discussed the University's ongoing quota-like goals to increase the percentage of persons with desired protected characteristics. In that meeting, Dr. Watkins stated, "we are not just talking about let's move our percentage and representation and composition from here to here . . . we often revert to things we can easily count because that's, you know, what we do. And I am as guilty of that as anybody. But it won't be enough to stop there."

*University Implements Financial Incentives for Diversity Hires*

27.     Among the "interventions" that Dr. Watkins' task force found to be effective were "institutional level [financial] incentives offered by the President, Provost, or Dean(s) to increase diversity in faculty hiring."

28.     These financial incentives were put into effect at the University of Utah in the University-wide "Faculty Hiring Initiative" ("FHI").

29.     Similarly, University records indicate that "All colleges [are] required to craft diversity action plans (to be tied to their budget requests)."

30.     Towards that end, University Deans were asked to describe how they "have allocated funds to create incentives for diversity hiring."

31.     Thus, as noted in the University of Utah's Academic Affair's statement on the SVPAA Guidelines, extra resources are provided to departments that succeed in hiring women and minorities.

32.     Specifically, starting in 2014, "[w]hen a scholar-teacher from an underrepresented group is the top candidate in an approved faculty search process, campus resources for salary support, up to 75K/year, will be available." That number is reduced to "40K/year" if the faculty candidate "from an underrepresented group" is the "desired second candidate in an approved faculty search process."

33.     No funds are available to departments if such candidates are the third or lower desired candidate or if the candidate from the underrepresented group is not actually hired.

34.     The program description further stated that, to oversee faculty searches, the "[Office of Equity and Diversity] will monitor the outcome of the search, indicate the financial commitment, and assist with recruitment efforts."

35.     Though some records label the FHI with the interval "2014-2017," that initiative was still "underway" as late as March 2019: "Faculty Hiring Initiative underway (in five years, increased faculty diversity from 13-23% domestic faculty of color)."

36.     The FHI was credited by Defendant as being highly influential in its effect on hiring decisions: "Through the Faculty Hiring Initiative, beginning in 2014, we have increased the total number of faculty from underrepresented groups by 27%, with domestic faculty of color growing from 13% to 23% of the total faculty body. We have crafted a complementary staff hiring initiative to accelerate hiring of staff from diverse backgrounds."

37.     The high-level administrator in charge of implementing the FHI, the Associate Vice President for Equity and Diversity (the "AVPED") at the time admitted that the intent of the FHI was to affect a change in the protected characteristics of the faculty candidates that were interviewed and hired by the Colleges and their respective departments.

38.     The AVPED also stated that "since the [FHI] was to increase diversity, I was always very pleased if diversity was increased, since that was -- that was the plan. That was what the hiring initiative was attempting to do.…"

39.     The FHI had at least two primary inducements: (i) by awarding or withholding salary funds from the colleges/departments on the strict basis of the protected characteristics of the candidates selected for hire; and (ii) by "signal[ing]" to "the individual colleges and departments that the university was serious about diversity hiring."

40.     The AVPED acknowledged that "undoubtedly" a purpose of creating the incentive funds was to "signal to the individual colleges and departments that the university was serious about diversity hiring."

41.     A "Caucasian male" candidate, like Dr. Felt, that did not fall into some other desired "category of diversity" was not eligible to be supported by the FHI funds.

42.     These programs continued for a long period of time at the University of Utah and were in place when Dr. Felt applied for a position in the ME Department.

*Accounting for Protected and Confidential Characteristics*

43.     To ensure that each department at the University of Utah applied diversity considerations and initiatives in determining the candidates to interview on-campus, Defendant

required each department to obtain approval from the University administration for the candidates selected for on-campus interview.

44.     Each University department would request approval for the candidates it intended to bring on-campus for interviews by submitting a Faculty Search Update form.

45.     The Faculty Search Update form required departments to report, and therefore, to take into account and focus on, the protected characteristics of faculty applicants, such as their sex and race, when making hiring decisions and selecting individuals for on-campus interviews.

46.     As the 2022 version of the Defendant's Faculty Hiring Guide admits, "These forms allow the [senior administration] to track and support diversity and inclusion efforts undertaken by the search committee and the unit."

47.     The University administration would evaluate whether the characteristics of the proposed interviewees met with the administration's diversity aspirations before it would approve the individuals to be interviewed.

48.     If the University administration deemed the candidates to be sufficiently diverse, it would approve them for interview.

49.     However, when the administration was displeased with the protected characteristics of the candidates selected by a search committee, the Faculty Search Update form and the associated approval process allowed the administration to pressure the department into selecting different candidates.

*The Threat of Administrative Reprisal*

50.     The University has held departments accountable for meeting the administration's narrow, quota-like definition of "diversity," which focused exclusively on the demographics of candidates selected for interviewing and hires.

51.     For instance, the University's Faculty Hiring Overview guide states: "Should [the list of interviewed candidates] appear too homogenous, a meeting will be requested between [the] Department Chair, Dean, cognizant Associate Vice President & Senior Vice President."

52.     A recent faculty search in Defendant's Physics Department illustrated how University leaders reacted to a search that "appear[ed] too homogenous."

53.     In an email dated January 5, 2019, the Dean of the College of Science, which houses the Physics Department, made the admittedly "significant decision" to "cancel" a faculty search a few months into it.

54.     The Dean confessed in his email that his reasons had nothing to do with the professional qualifications of the applicants.

55.     Rather, he "summarize[d] [his] thoughts that went into [his] decision" as follows:

- "The faculty applicant pool was ~115 total, with 3 female applications identified."

- "No female applicant made the 'top cut' of ~20, and the final six candidates chosen for an on-site interview are all male."

- "The other three ongoing searches in the Department are also dominated by male candidates identified for interviews, approximately 17 of 18 are white males, if I recall correctly."

- "My decision to cancel this search is made in context of these overall search results."

9

56.     In discussing "the lack of a diverse candidate pool," the Dean acknowledged that the "the search committee was clearly very proactive in attempting to attract a diverse applicant pool." But he further noted:

•     "the lack of diversity within the applicant pool is striking";

•     "a search that is nearly completely devoid of diversity is simply unfair to female and other underrepresented scientists . . . [though he] appreciate[s] that these groups may not be well represented in [the particular field of physics being hired for]";

•     the "department lacks gender diversity. There are only 4 female faculty, and no female full professors. Allowing this search to proceed is simply perpetuating this problem, kicking the problem down the road for others to address. I believe it will take at least 10 years, or longer, for the Department to achieve the level of equity and diversity that everyone wants."

57.     The Dean then declared: "I am confident that I speak for Ruth [Watkins, the University President], Dan [the SVPAA], and everyone in the administration that there will be tremendous support for search plans that yield excellence (which requires diversity)."

58.     In short, the search was canceled because of the protected characteristics of the top candidates—that is, they were white men rather than female or racial minorities.

59.     As part of this series of events, the department was reminded (on behalf of the entire upper University administration) that their hiring decisions must "yield" (or result in) "diversity."

### The College of Engineering and ME Department Implement the University's Discriminatory Policies and Initiatives

#### The College of Engineering Implement Diversity Hiring Procedures

60.     Following the directives from the University administration, the College of Engineering similarly "established diversity hiring procedures."

61.     These "established procedures" include provisions to "give qualified ["minority and women candidates"] a chance to interview."

62.     In addition, the College of Engineering reports that, "Every year, each department [in the College] makes a concerted effort to attract, interview and hire minority and women candidates."

63.     The College of Engineering 2016-17 Budget Narrative reports: "We made great efforts, as always, to recruit women and minority faculty. Last year three of the tenure-line faculty were women. Three female faculty candidates have accepted our offers so far this year. We appreciate the support of the Diversity Office with regard to our efforts to recruit women faculty; we regret that our success rate has not been better (a number of offers have been made), but there is great competition for these candidates."

64.     The College Dean, Richard Brown, testified that they were under pressure to hire specific classes of candidates:

Q: "Have you ever felt any pressure from anyone above you in the chain of command to hire … a specific class of candidates?"

A: "There have been programs from people in the Central Administration that have overtly encouraged hiring minority faculty members."

65.     The Dean was "aware" of aggressive individuals from the "diversity office" who applied "overt encouragement or direction[s]" "to increase diversity." He was "aware of that [pressure] as the dean of the college of engineering" and affirmed that he would "expect other people, department chairs, search committee members, faculty more generally, [to] also be aware of this overt encouragement."

66.     Not surprisingly, the ME Department responded to the Defendant's administrative directives and financial incentives by disadvantaging white, American, male candidates.

11

67.     Concurrent with the decision to open the position to which Dr. Felt applied, the department was obliged to conduct a "self-study" that included an investigation into the success of their efforts to reduce the proportion of faculty that were white, male or from the United States.

68.     In the study's discussion, the department referred to otherwise qualified "domestic" "white male" candidates as "challenges" in their efforts make the faculty "more diverse."

69.     Moreover, the department apologized for the fact that "one additional Caucasian faculty member was added since the last review," but it sought to downplay this hire by explaining that "the percentage of Caucasian faculty members has actually decreased from 84.6% to 60.5%."

70.     The success of the department's diversity hiring efforts were measured in a quota-like manner and focused exclusively on the protected characteristics of the individuals hired. The manifest goal was to use diversity hiring and natural attrition to reduce the proportion of faculty members who were men, US-born and/or Caucasian. Relevant statements from the self-study include:

- "The faculty has become more diverse since the last review. As shown in Table 2.9, the number of international faculty members has increased from 4 to 13 while the percentage of international faculty members has increased from 15.4% to 34.2%."

- "Although one additional Caucasian faculty member was added since the last review, the percentage of Caucasian faculty members has actually decreased from 84.6% to 60.5%."

- "Our program has increased the total number of female faculty members from 4 to 8 and the percentage of female faculty members from 15.4% to 21.0% since the last review"

- "[T]he faculty has become more diverse since the last review. However, challenges remain as … domestic candidates are overwhelmingly white males."

71.   This departmental self-study was followed-up by Defendant's administrative reviews of the department. These reviews were contemporaneous with the department's consideration of Dr. Felt's application.

72.   These reviews "[recognized] that challenges remain concerning faculty diversity" and charged the department to "continue and expand" its "efforts" and the "various measures" that it had put in place to reduce the proportion of Caucasians, males, and persons from the United States among its faculty.

73.   In a signed Memorandum of Understanding, the ME Department acknowledged Defendant's directives, committed to carry them out, and agreed to provide the administration written updates on its progress.

74.   In a similar written update, the ME Department chair who oversaw the actions related to the Plaintiff, Dr. Tim Ameel, stated in a signed 2017 letter responding to the direction he had been given to hire candidates who were either not men, not US-born or not white, "This particular task will never be fully addressed. The department will continue to work to increase the diversity of its faculty and student body."

*The ME Department is Motivated by the FHI and Other Financial Diversity Incentives*

75.   In addition, the University's financial incentives for diversity hires, including the FHI, did not go unnoticed by the ME Department.

76.   The ME Department's Faculty Meeting Minutes from January 14, 2015 record that university-level "diversity hiring" incentives were a point of discussion. The minutes note that the faculty considered the funds as "available for any minority hire." Further, the minutes state:

"Diversity hiring: there is a new university level diversity hiring plan with funds available for any minority hire (up to 50% of salary for four years)."

77.     Similarly, the Department's 2015-2020 Strategic Plan records that the ME Department took "diversity funding" into account when calculating how many new faculty members it could hire.

78.     When asked about the financial incentives for hiring "diverse" candidates, Tim Ameel, ME Department chair at the time, specifically clarified that such incentive funds not only made it easier to hire diverse candidates but "made it possible." He explained the funds were a way to "help the department from the budget side" and that he "saw it as an opportunity to help the department basically move some of [its] expenses into the future."

### *The University Administration Rebuked the ME Department for a Lack of Diversity Immediately Before Discriminating Against Dr. Felt*

79.     In or around the time that the ME Department was considering Dr. Felt for a position within the department and for an on-campus interview, the department had submitted a list of names for on-campus interview approval that happened to include only male candidates.

80.     Emails record that this was considered by the senior administration to be "dismal diversity-wise" and resulted in the department chair receiving a phone call from the senior administration regarding their concerns about the sex of the candidates that had been found most qualified for the position.

81.     After receiving this call, the ME Department submitted a new permission form, which included a female finalist. One of the administrative staff replied saying, "Well! [The call] must have had an impact with Mechanical Engineering. PRN00161CF update adds a female candidate to their previously approved group of 4 male and 1 unknown so that's positive.

14

Approved!" The response from the individual who made the call was: "Yes, I think ME is getting the message!"

82.    This is consistent with the University's official "Faculty Hiring Guide," which states that in response to a submitted form the administration "may ask for more information regarding the search committee's decision-making processes." And that "search committees may be asked to reconsider their evaluation processes."

83.    In the September 2023 version of the official guide, the last phrase is extended to read "search committees may be asked to reconsider their evaluation processes in order to broaden the interview pool." Note that the search committees are not being asked to solicit more applications but, rather, to change the way they "evaluate" candidates such that a desired "diversity" result is achieved.

84.    This is consistent with more recent versions of the Faculty Search Update form, which explicitly asks search committees to describe how they "evaluate[d] [candidates] in relation to [their] departments diversity goals" or, another version, how they "evaluate[d] [candidates] in relation to [their] department's equity, diversity, and inclusion goals."

85.    Furthermore, in the search conducted by the ME Department for the very position for which Dr. Felt applied, Defendant's internal emails show that it considered the applicants' self-reported characteristics.

86.    The Department was reporting race and gender to the Administration in the Faculty Search Update forms, with Defendant cross-checking these reports with the supposedly confidentially provided demographic information the applicants provided to confirm their race and gender.

***Dr. Felt Applied for an Open Assistant Professor Position at the University of Utah***

87.     Dr. Felt has a deep and sincere desire to serve the state of Utah as a teacher and researcher at the University of Utah.

88.     Accordingly, Dr. Felt applied for an open robotics-focused faculty position in the Utah Robotics Center and ME Department in the fall of 2017.

89.     The position for which he applied had an anticipated start date of July 2018.

*Dr. Felt was More Than Qualified for the Position for Which he Applied*

90.     At the time of his first application to the University of Utah, Dr. Felt was highly qualified to serve in the rank of Assistant Professor within the University of Utah's ME Department.

91.     Specifically, Dr. Felt was a highly qualified candidate for the position to which he applied in the ME Department.

92.     Dr. Felt completed his BS degree in Mechanical Engineering at BYU and was accepted to pursue a PhD at the University of Michigan in Ann Arbor, ranked the fifth-best mechanical engineering graduate program in the country.  (*See* Best Mechanical Engineering Programs, U.S. News & World Report, https://www.usnews.com/best- graduate-schools/top-engineering-schools/mechanical-engineering-rankings.)

93.     At the University of Michigan, Dr. Felt was awarded a three-year Graduate Research Fellowship from the National Science Foundation, the most prestigious fellowship a graduate student can receive in the United States.

94.     While a graduate student, Dr. Felt also won the 2015 Prize for Contributions in Soft Robotics Research from Harvard University after competing against 82 teams from over 20 countries.

95.     And he was one of three finalists for Best Systems Paper at the most prestigious robotics conference in the world, where, as a graduate student, he was competing against experienced engineering professors.

96.     Dr. Felt also published six (6) articles in robotics, engineering, and scientific journals. In five (5) of these six (6) articles, Wyatt was designated as the first author, *i.e.*, the lead contributor.

97.     One of those articles was based on methods he developed that later enabled work by some of the top robotics researchers in the world, including at Harvard and Stanford.

98.     In addition to his journal papers, Dr. Felt had presented three full-length, peer-reviewed papers at top robotics conferences, all three of which he was the first author.

99.     Further, Dr. Felt did this all while earning a Master's Degree and PhD in mechanical engineering in just four years—well ahead of the average time for his prestigious program.

100.    In short, it was clear, even then, that Dr. Felt was a budding star in the world of robotics and mechanical engineering.

101.    Upon graduating from the University of Michigan, Dr. Felt completed a post-doctoral fellowship at the world-renowned Swiss Federal Institute of Technology in Lausanne in Switzerland.

102.    By the fall of 2017, Dr. Felt's award-winning research was already making waves and was widely cited.

103.    In addition, Dr. Felt received numerous awards nationally and internationally for his accomplishments.

104.    For example, before starting undergraduate schooling, Dr. Felt won Third Prize in the iRobot Create Contest, creating a robot that would later serve as the inspiration for "PrintBot," which is now in the iRobot Hall of Fame.

105.    Dr. Felt helped found and lead Owlet Baby Care where, as the Head of Product Development, he developed technology that would go on to protect the lives of at-risk infants.

106.    He has invented many valuable technologies, is listed as the principal inventor on six provisional patent applications, and as a co-inventor on three others.

107.    Since the time of his application, Dr. Felt has proposed, won, and directed millions of dollars of government-funded research as a Principal Investigator.

108.    Dr. Felt's qualifications and potential were apparent to the department and search committee that evaluated Dr. Felt's candidacy both at the time of his application and throughout the hiring process.

109.    Dr. Felt has also applied to other Universities, was interviewed on-campus, found to be highly qualified, and was recommended as worthy of hire by other prestigious departments.

110.    These opportunities were complicated, however, by Dr. Felt's manifest and sometimes confessed deep desire to live and work in Utah and, specifically, serve as a faculty member at the University of Utah.

*Dr. Felt was a Good Fit for the Position to Which he Applied*

111.    The ME Department was looking a robotics position that coincided with Dr. Felt's specific expertise, making him a "good fit."

112.    Though not listed in job posting, the ME Department's Strategic Plan listed the "areas of interest" in which the ME Department sought to hire. These areas included "Bio-medical design," "Rehabilitation engineering," and "Soft robotics."

113.    The department chair reaffirmed that "soft robotics" was part of the department's robotics-related "area of [hiring] interest" in a letter dated May 17, 2018. That letter affirms that the areas of interest were "examined and updated each successive summer."

114.    Dr. Felt did not know at the time the areas of hiring focus for the ME Department.

115.    Though these strategic interests were unknown to Dr. Felt at the time of his application, they aligned nearly perfectly with Dr. Felt's own research expertise, as summarized in his application: "My research leverages advanced soft robotic methods to improve the performance and accessibility of wearable and medical devices."

116.    On January 30, 2018, the search committee recognized Dr. Felt's research interests and expertise to the department chair with the phrase "Research in soft robotics."

117.    The department chair at the time and the chair of the ME Department's search committee for the position to which Dr. Felt applied both testified that Dr. Felt's research area of soft robotics was a "preferred emphasis" for the individual they hired.

118.    The search committee chair testified that Dr. Felt's research interests, including complementary interests (e.g., "overlap") between Dr. Felt and other members of the Department were known prior to the screening interviews.

119.    This alignment of Dr. Felt's expertise with the department's specific interest, often colloquially described as "fit," was well known to the search committee and department.

120.     Dr. Felt's complementary research interests were described by the search committee in positive terms as "opportunities for collaboration": "Good publication record in good venues. Biomedical start-up in Lehi. Wants to work in the area of soft robotics for wearable and medical devices. Good fit for our group, with opportunities for collaboration."

121.     The search committee's documented evaluation criteria also listed "potential collaboration opportunities" as a positive factor when evaluating a candidate's fit.

122.     Additionally, when the search committee evaluated applicants for the position to which Dr. Felt applied, it rated him as one of the top candidates.

### ***Defendant Discriminated Against Dr. Felt***

#### *Dr. Felt's Protected Characteristics*

123.     Dr. Felt's intersectional protected characteristics include white, Caucasian, male, and national origin from the United States.

124.     Dr. Felt's intersectional protected characteristics also include his religion, as an active longtime member of The Church of Jesus Christ of Latter-day Saints, and his religious associations as a former full-time volunteer missionary for the Church and a graduate of Brigham Young University – Provo.

125.     These intersectional protected characteristics were known to Defendant at the time of Defendant's acts alleged in this Complaint.

126.     The search committee and department were also aware of Dr. Felt's race, sex, national origin, religion, and religious associations.

127.    In connection with his application to the ME Department for the open position, Dr. Felt included his resume/curriculum vitae ("CV"). That CV included a headshot, clearly revealing his race (white) and gender (male).

128.    Dr. Felt's CV also indicated that he is a "US Citizen."

129.    It also listed his two-year experience as a "Volunteer Ecclesiastical Instructor" in Ecuador.

*Candidates Without Dr. Felt's Protected Characteristics Were Given Preferential Treatment*

130.    Similarly qualified individuals, not of Dr. Felt's intersectional protected classes, were given preferential treatment.

131.    Based on Dr. Felt's interests and expertise, the search committee initially found Dr. Felt to be a "good fit" for the position to which he applied.

132.    Dr. Felt passed his screening interview with the search committee and was referred by the search committee to the department as one of the few select candidates "worthy" of an on-campus interview. The search committee asked the ME Department chair the approve a list of on-campus interviews, which included Dr. Felt.

133.    Dr. Felt was scored with a perfect score ("best") – tied with the five best candidates.

134.    Despite being qualified and considered "worthy" of an interview, the ME Department ultimately refused to refer Dr. Felt for an on-campus interview.

135.    Rather than basing the decision of whom to interview, the ME Department admittedly took into consideration "diversity characteristics" when deciding whom to invite.

136.    Indeed, one search committee member has testified that the search committee considered diversity characteristics "when asking for permission to conduct further interviews with

candidates that have been identified by a committee" and to place the candidates in order based on such diversity considerations.

137.    When the Faculty Search Update form was submitted for the position to which Dr. Felt applied, the department labeled the candidates with the protected characteristics perceived by the search committee (*i.e.*, "Caucasian male", "Asian male", "Caucasian female"). Dr. Felt was labeled a "Caucasian male."

138.    In addition, despite being qualified and a good fit, Defendant refused to hire Dr. Felt.

139.    Defendant believed and knew that Dr. Felt was qualified for the position at the time that it refused to interview or hire him.

140.    Defendant discriminated against Dr. Felt because he is a white male from the United States and because of his religion and religious associations with The Church of Jesus Christ of Latter-day Saints.

*Special Treatment of the Female Candidate*

141.    Consistent with ranking candidates based on protected "diversity" characteristics, the search committee listed a female candidate as its first preference.

142.    The ME Department initially submitted a Faculty Search Update form claiming that the female candidate was the only finalist for the robotics search and sought approval of only the female candidate for an on-campus interview.

143.    Whereas the department's earlier group of candidates (all males) for another search had caused consternation and intervention from the administration, the University administration readily approved sole female "finalist" in the robotics search.

144. The preferential treatment of the female candidate over all the male candidates was later referred to as "special treatment" by the subsequent department chair.

145. Dr. Felt was at least as qualified, if not more qualified, and a better fit for the open position than the female candidate.

146. The search committee chair admitted that, as measured by their "gold standard" of work and impact, Dr. Felt's objective qualifications exceeded those of the female candidate. The department chair similarly admitted that he was not "aware of anything that rendered Dr. Felt… less desirable than [the female candidate] for an on-campus interview."

147. Indeed, whereas the evaluation records show that Dr. Felt as considered a "good fit," the documents show that they worried that the female candidate was a "better fit to [another departmental division] than the Robotics division."

148. Yet, despite her poor "fit" and objectively lower qualifications, the female candidate was consistently more highly ranked by the search committee, both before and after her screening interview.

149. If she was the top-ranked candidate and later accepted, the ME Department could have received an additional $75,000 annually towards her salary, fulfilled its documented diversity obligations, and appeased the University administration, which had just intervened in a parallel search in the department when no female candidates had been invited to interview on campus.

150. When asked to explain the preferential treatment given to the female candidate, the department chair who oversaw the "special treatment" testified that the department knew that she had received an employment offer from a specific university. However, this was not true. The

documentary evidence shows she would not receive this offer for several weeks, immediately before she withdrew her candidacy ahead of her scheduled on-campus interview.

*The University Required the Department to Justify Hiring a "Caucasian Male"*

151.    Later, the Defendant included male candidates on the Faculty Search Update form – the form used to request approval for on-campus interviews, including candidates considered more "diverse" than Dr. Felt.

152.    One candidate identified on the Faculty Search Update form as "Asian" was listed ahead of Dr. Felt in the order of preference despite not having yet received a screening interview. Ultimately, this candidate did not pass his screening interview and was removed from the form.

153.    The search committee chair later testified that the committee was concerned about problems with the administrative approval of the prospective interviewees if the preference list was not sufficiently diverse.

154.    The chair's testimony is consistent with an email that was included with the list at the time, that reported that their preference list was "quite diverse, so I don't see any potential problem."

155.    During this time, emails were exchanged between the search committee chair and a department administrator regarding the composition of the Faculty Search Update forms. In earlier formal administrative proceedings, the Defendant was ordered to disclose these emails to the Petitioner but, despite repeated specific requests from the Petitioner, failed to do so.

156.    Though the department did list one "Caucasian male" candidate on the Faculty Search Update form, the form openly fretted that this candidate would not "strengthen the visibility" of their group, which is coded language about his race and sex.

157.    This "Caucasian male" was a tenured professor at another University and was ultimately excluded from the official robotics search. His name was excluded, for example, from the list of "three" on-campus invited interviewees (two of which dropped out before their on-campus interviews).

158.    Although Dr. Felt had been referred by the search committee to the department chair for on-campus interview approval, the Defendant repeatedly declined to include Dr. Felt's name on the official Faculty Search Update form seeking on-campus interview approval from the upper University administration.

159.    This form obligated the ME Department to identify and focus on the race and sex of Dr. Felt. The form would require them to explain to the upper administration why they wanted to interview and possibly hire a candidate they described as a "Caucasian male."

160.    The University's upper administration had rebuked the ME department just a few weeks prior, for submitting a Faculty Search Update form with candidates that the administration called "dismal diversity-wise."

161.    Thus, even when the few candidates that were included on the Faculty Search Update form began withdrawing their candidacy one by one, leaving Dr. Felt as the top-ranked candidate worthy of an on-campus interview and interested in the position, the Defendant refused to extend an on-campus interview invitation to Dr. Felt.

162.    Dr. Felt was assured by the search committee chair throughout the process that he had "not been eliminated" and was "officially under consideration."

163.    Indeed, the Faculty Search Update forms submitted and approved affirmed: "We plan to invite additional final candidates but need to invite those listed above so we can be

competitive in a time-sensitive market. We will submit a revised form when we have more final candidates we would like to bring to campus."

164.    Yet when all but one of the candidates were excluded or withdrew from consideration, the Defendant still declined to submit Dr. Felt's name to the administration.

165.    The one candidate who did receive an on-campus interview as part of the search was described by the department on the form as an "Asian male." He had been listed by the committee just above Dr. Felt in the preference list. The committee's rankings of the Asian male compared to those of Dr. Felt are statistically indistinguishable.

166.    By way of comparison in treatment, the ME Department moved forward with an on-campus interview of this "Asian" candidate and extended an employment offer.

167.    In contrast, the ME Department would not submit even Dr. Felt's name to the administration for on-campus interview approval.

168.    Ultimately, the ME Department did not submit Dr. Felt's name to the upper administration for approval.

### _The Discrimination Against Dr. Felt was Motivated by Defendant's Initiatives and Policies_

169.    The discriminatory treatment of Dr. Felt was influenced by intense administrative pressure, as well as experiences within the department and in other departments, regarding the need to focus on gender and race when hiring new faculty.

170.    As explained above, Defendant had monetary incentive programs, such as the FHI, in place to reward departments that hired candidates deemed to be sufficiently "diverse."

171.    The intent behind these incentives was clearly stated in the program description that was listed on the Associate Vice President for Faculty's website.

172.    The university-wide program expressly created financial incentives for departments that hired non-male and non-white candidates.

173.    Thus, the program intended to influence hiring decisions in a way that gave preference to certain candidates on the basis of their protected characteristics.

174.    The discriminatory intent of these programs is made clear by the structure of the incentives.

175.    If, for example, the intent was to encourage departments to solicit applications from a broad applicant pool, then one would expect to see the financial incentives tied to those efforts. For example, departments that showed a substantial increase in the number of applications from underrepresented groups could be rewarded, regardless of the outcome of the search.

176.    Defendant's FHI, by contrast, conditioned funds on hiring decisions, not application solicitation efforts, because its goal was to "Increase Faculty Diversity" (as stated in its title), not to "Increase Faculty Applicant Diversity."

### *Pretextual Justifications*

177.    The Defendant has resorted to baseless, time-shifting, and pretextual reasons to justify the discriminatory treatment of Dr. Felt, including claiming after the fact they were "not interested" in hiring someone with an expertise in "soft robotics," and claiming at the time that they could not interview Dr. Felt because they were "actively pursuing" a candidate that had been excluded from the search and, in any case, would preclude their purported overtures just a few days after they made the claim to Dr. Felt.

178.    Despite Dr. Felt's clearly expressed interest, good fit, and apparent qualifications, the Defendant refused to allow Dr. Felt to even interview on-campus.

179.    Though they knew Dr. Felt was "qualified" for the position (he was marked as such in their system) and had been found "worthy" of an on-campus interview; and though they had only interviewed one "Asian" candidate as part of the search; and though the Defendant had assured Dr. Felt that the selection process would "continue until a successful candidate is chosen;" the Defendant declined to submit Dr. Felt's name to the administration for approval and faithlessly declared a "failed search," closing the unfilled faculty position.

*__The Pattern and Practice of Discrimination Against Latter-day Saints__*

180.    In the years preceding Dr. Felt's application, the ME Department had treated other highly qualified and top-ranked Latter-day Saint candidates in a discriminatory way.

181.    Even after impressive on-campus interviews, when these Latter-day Saint candidates were at the top of the list, the department faculty would vote to reject the candidates and close the unfilled position.

182.    For example, just a few years prior to Dr. Felt's application, the ME Department held an on-campus interview with a tenured, highly successful, and beloved Associate Professor at BYU. After a dynamic on-campus interview outlining his very productive research program, the department faculty voted that he was an "unacceptable" candidate and decided to leave the position unfilled.

183.    Another Latter-day Saint faculty applicant who was a "finalist" applying to the same department shortly before Dr. Felt faced the same "failed search" treatment that the tenured professor from BYU and Dr. Felt received.

184.    There are currently no tenure-track faculty members in the University of Utah's ME Department with degrees from BYU earned later than 1997.

## FIRST CLAIM FOR RELIEF
### (Violation of Title VII)

185.   Plaintiff hereby incorporates by reference all preceding paragraphs.

186.   Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire … any individual, or otherwise discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

187.   Title VII also makes it an unlawful employment practice "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2).

188.   Defendant is an employer subject to Title VII.

189.   Plaintiff is a protected individual on account of, as relevant here, his race, religion, sex, and national origin.

190.   Plaintiff was qualified for a faculty position with Defendant in the ME Department.

191.   Despite being qualified and found to be a good fit for the position, Plaintiff was not submitted for approval for an on-campus interview and therefore suffered adverse employment action.

192.   Despite being qualified and found to be a good fit for the position, Plaintiff was not hired by Defendant and therefore suffered adverse employment action.

193.   Defendant's refusal to hire Plaintiff was because of Plaintiff's protected characteristics – namely his race, religion, sex, national origin, or any combination of them.

194.   At the least, Plaintiff's protected characteristics were a motivating factor in Defendant's decision not to hire him in the ME Department.

195.     In addition, Defendant segregated and classified applicants for employment, including Plaintiff, by race, color, religion, sex, or national origin.

196.     By segregating and classifying applicants by race, color, religion, sex, or national origin, Plaintiff was denied employment opportunities with Defendant.

197.     Plaintiff has been harmed, both professionally and financially, because of Defendant's actions.

198.     Defendant is liable to Plaintiff for its violations of Title VII.

199.     As a result of Defendants' actions in violation of Title VII, Plaintiff is entitled to instatement and an award of damages for Defendants' discriminatory actions, including but not limited to lost wages (in the form of back pay and, if appropriate, front pay), lost benefits, emotional harms, reputational harms, and other compensatory damages.

200.     As a further result of Defendant's actions, Plaintiff has incurred attorney's fees.

### SECOND CLAIM FOR RELIEF
**(Violation of the Fourteenth Amendment and 42 U.S.C. § 1983)**

201.     Plaintiff hereby incorporates by reference all preceding paragraphs.

202.     The Fourteenth Amendment to the United States Constitution provides: "No State shall … deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

203.     The Fourteenth Amendment also incorporates the First Amendment against the States, including the prohibition on religious discrimination. *See Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246, 2254 (2020) ("The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against 'laws [and government conduct] that impose special disabilities on the basis of religious

status.'" (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2021 (2017))).

204.   42 U.S.C. § 1983 provides a right of action to any person who has been deprived by a state actor of "any right, privileges, or immunities secured by the Constitution and laws."

205.   Defendant is a public institution of higher education and a state actor for purposes of the Fourteenth Amendment and Section 1983.

206.   Through its discriminatory hiring practices, including but not limited to the FHI, Faculty Search Update forms, and other acts detailed herein, Defendant has denied individuals, including Plaintiff, the equal protection of the laws by treating similarly situated individuals differently on account of protected characteristics of race, national origin, sex, and religion.

207.   The FHI is facially unconstitutional as it provides preferential treatment to individuals on the basis of their sex, race, national origin, and other protected characteristics.

208.   The FHI is not justified by any reasonable, substantial, or compelling government interest.

209.   The Faculty Search Update forms explicitly list applicants' protected characteristics and are used in making employment decisions.

210.   Plaintiff has been harmed by Defendant's unlawful acts and the violation of his constitutional rights.

211.   By discriminating against Dr. Felt because of his sex, race, color, national origin, and religion, Defendant violated the Fourteenth Amendment to the Constitution of the United States.

212.     As a result of Defendants' actions in violation of the Fourteenth Amendment to the Constitution of the United States, Plaintiff is entitled to instatement and an award of damages for Defendants' discriminatory actions, including but not limited to lost wages (in the form of back pay and, if appropriate, front pay), lost benefits, emotional harms, reputational harms, and other compensatory damages.

213.     As a further result of Defendant's actions, Plaintiff has incurred attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wyatt Felt respectfully requests for relief as follows in his favor and against Defendant the University of Utah:

A.     An order compelling Defendant to instate Dr. Felt as an Assistant Professor in the Department of Mechanical Engineering and Utah Robotics Center of the College of Engineering, University of Utah;

B.     An order compelling Defendant to pay to Plaintiff back pay and equivalent benefits (including academic benefits) for Dr. Felt, dating from July 2018, and, if appropriate, front pay from Defendant;

C.     An order compelling Defendant to pay to Plaintiff compensatory damages for the delay in entering academia, and the subsequent lost opportunities to publish, participate in conferences and research, as well as the delay in eventually obtaining tenure and a higher salary;

D.     An order compelling Defendant to pay for Dr. Felt's attorney fees and other related costs consistent with 42 U.S.C. § 2000e-5(k);

E.     An order compelling Defendant to cease any and all discriminatory or prohibited employment practices in faculty hiring, including:

(i)      Awarding or withholding faculty hiring funds from departments on the basis of the protected classes of those hired by the departments;

(ii)     Compelling faculty search committees to guess at, take into account, and report the protected characteristics of faculty candidates such as gender, race/ethnicity, national origin, and sexual orientation when referring candidates for approval for on-campus interviews;

(iii)    Improperly disclosing voluntarily reported information about the protected characteristics of applicants when making hiring and interview decisions, despite promising applicants no such disclosure would occur;

(iv)     Threatening and carrying out administrative reprisals for search committees and departments that interview and hire candidates within certain undesired protected classes;

(v)      Requiring departments to regularly report their progress in meeting explicit directives to reduce the proportion of certain undesired protected classes among their faculty;

(vi)     Violating the confidentiality of candidates' disclosures of protected characteristics and taking those characteristics into account when evaluating whether candidates can be invited for on-campus interviews or hired; and

(vii)    Any other discriminatory practices which may be discovered through these or future proceedings.

F.       Such other relief to Plaintiff as the court deems just and proper.

DATED this 24th day of January 2024.

**KIRTON | McCONKIE**

*/s/ Ryan B. Frazier*
Ryan B. Frazier
Jonathan M. Burt
*Attorneys for Plaintiff*