Ryan B. Frazier (9007)
Jonathan M. Burt (16794)
KIRTON McCONKIE
Kirton McConkie Building
36 South State Street, Suite 1900
Salt Lake City, Utah 84111
Tel. (801) 328-3600
Fax (801) 321-4893
rfrazier@kmclaw.com
jburt@kmclaw.com

*Attorneys for Plaintiff Wyatt Felt*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WYATT FELT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF UTAH,<br><br>Defendant. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:24-cv-00063<br><br>Judge Ann Marie McIff Allen<br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ..... 5

RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ..... 6

STATEMENT OF ADDITIONAL MATERIAL FACTS ..... 21

I. The Faculty Hiring Initiative ..... 21

A. The ME Department Intentionally Made Diversity Hires ..... 22

SUMMARY JUDGMENT STANDARD ..... 31

ARGUMENT ..... 32

I. Felt Has Direct Evidence of Discrimination Because the FHI Facially Discriminates Against White Males in Favor of Minority Candidates. ..... 32

II. Felt Can Establish a Prima Facie Case of Discrimination. ..... 35

A. Felt Applied for An Open Position but Was Rejected Under Circumstances That Give Rise to an Inference of Discrimination. ..... 35

B. The University's Contrary Arguments Are Unpersuasive. ..... 38

III. Felt Can Establish Pretext, Or at the Least a Question of Fact for Trial. ..... 39

CONCLUSION ..... 43

## TABLE OF AUTHORITIES

Page (s)

Federal Cases

145 S. Ct. & n.1 .......... 38
*Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540 (2025) .......... 31, 35, 37
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 31
*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006) .......... 38
*Bass v. Board of County Commissioners*, 256 F.3d 1095 (11th Cir. 2001) .......... 33, 34
*Celotex Corp v. Catrett*, 477 U.S. 317 (1986) .......... 31, 33
*Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373 (10th Cir. 1994) .......... 40
*Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) .......... 33
*Exum v. U.S. Olympic Committee*, 389 F.3d 1130 (10th Cir. 2004) .......... 36, 39
*Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875 (10th Cir. 2018) .......... 40
Felt "unworthy of c*redence." Walking*stick Dixon, 125 F.4th .......... 43
*Flitton v. Primary Residential Mort., Inc.*, 614 F.3d 1173 (10th Cir. 2010) .......... 14
*George v. Youngstown State Univ.*, 966 F.3d 446 (6th 2020) .......... 16, 40, 41, 42
*Graham v. Bristol Hospice Holdings, Inc.*, No. 2:21-cv-00754-TS-DBP, 2024 WL 5119970 (D. Utah Dec. 16, 2024) .......... 31
*Heim v. Utah*, 8 F.3d 1541 (10th Cir. 1993) .......... 32, 33
https://www.westlaw.com/Document/I4a8af280c88f11eaa483ae2f446c35bb/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0 *v. Youngstown State Univ.*, 966 F.3d 446 (6th 2020) .......... 42
https://www.westlaw.com/Document/I6cc65d0d798911d99c4dbb2f0352441d/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0 *v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000) .......... 39
https://www.westlaw.com/Document/I9d039c6541e511f09c24b294e5761db2/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0 *v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540 (2025) .......... 35, 38

*Kendrick v. Penske Transp. Servs., Inc.*,
220 F.3d 1220 (10th Cir. 2000) .......... 36, 37, 39
*Khalik v. United Air Lines*,
671 F.3d 1188 (10th Cir. 2012) .......... 32
*Lazy S. Ranch Props., LLC v. Valero Terminaling & Dist. Co.*,
92 F.4th 1189 (10th Cir. 2024) .......... 6, 10
*McDonnell Douglas*,
411 U.S. .......... 35
*McNellis v. Douglas County Sch. Dist.*,
116 F.4th 1122 (10th Cir. 2024) .......... 32
*Nat. Gas Co. v. Nash Oil & Gas, Inc.*,
526 F.3d 626 (10th Cir. 2008) .......... 31
*Notari v. Denver Water Dep't*,
971 F.2d 585 (10th Cir. 1992) .......... 38
*Shen Engineering, Inc. v. Brighton*,
748 F. Supp. 3d 1086 (D. Utah 2024) .......... 31
*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
600 U.S. 181 (2023) .......... 34
*Swackhammer v. Sprint/United Mgmt. Co.*,
493 F.3d 1160 (10th Cir. 2007) .......... 39
*Texas Dep't of Community Affairs v. Burdine*,
450 U.S. 248 (1981) .......... 35
*Trans World Airlines, Inc. v. Thurston*,
469 U.S. 111 (1985) .......... 33
*Walkingstick Dixon v. Oklahoma ex rel. Regional Univ. Sys. of Oklahoma Bd. of Regents*,
125 F.4th 1321 (10th Cir. 2025) .......... 8, 36, 39, 40
*Yazdian v. ConMed Endoscopic Techs., Inc.*,
793 F.3d 634 (6th Cir. 2015) .......... 41

Federal Statutes

42 U.S.C. § 2000e-2(a)(1) .......... 32

Federal Rules

FED. R. CIV. P. 7 .......... 5, 43
FED. R. CIV. P. 56(a) .......... 6, 31

Plaintiff Wyatt Felt ("Plaintiff" or "Felt"), by and through counsel and pursuant to Rules 7 and 56 and DUCivR 7-1 and 56-1, hereby submits this Opposition to Defendant's Motion for Summary Judgment.

## INTRODUCTION

Defendant's Motion for Summary Judgment (the "Motion") must be denied. The Motion presents a straightforward issue: Did the University of Utah's Department of Mechanical Engineering refuse to advance Felt because of his protected characteristics? The answer, when viewed through the lens of the University's own policies, statements, and conduct, is "yes."

Felt applied for a tenure-track faculty position in Robotics for which he was well qualified. He was ranked among the top applicants and deemed worthy of an on-campus interview by the department's search committee. Yet, despite the need for faculty and the attrition of the other highly ranked candidates, the University did not offer Felt an on-campus interview. Instead, the Robotics search group extended special treatment to the only qualified female candidate—even while it found her to be a better fit for a different group than Robotics (*i.e.*, the DEMS group) — and abruptly closed the search after just one on-campus interview, something members of the search committee testified "never" happens.

Why? Because inviting Felt—a Caucasian male and member of The Church of Jesus Christ of Latter-day Saints—would have required the ME Department to submit his name (along with his race and sex) for administrative approval from the University's Orwellian Office for Equity and Diversity (the "OED"). The University, through the OED, exerted pressure on University departments ***to hire*** (not just interview) diverse candidates and created a program that explicitly tied funding and hiring incentives to protected characteristics. That program, the Faculty Hiring

Initiative ("FHI"), offered financial support only for "diverse" hires. Felt, as a Caucasian male, did not qualify.

The University justifies its decision not to interview Felt by claiming it was not "excited" about Felt. But that subjective assessment rings hollow in light of the procedural irregularities, shifting justifications, and evidence that protected characteristics motivated who got interviews and offers. Plaintiff, therefore, respectfully requests that the Court deny the Motion.

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to DUCivR 56-1(c)(3), Plaintiff restates only those facts that are genuinely disputed or immaterial, that need additional information or explanation, or that are subject to an objection. UTBS does not dispute and does not restate Fact Nos. 1-8, 10-15, 17-18, 20-21, 24, 26-27, 31-32, 35-45, 47, 50-59, 62-63, 65-67, 69, 79, 81, 84, 91-94, & 97-98.[1]

9. The pre-written "Skype Questions for Robotics Faculty Search" stated that the Department was "not in immediate need for a Fall 2018 start" for the open Robotics Position.

**Response:** Disputed. This Skype questionnaire permitted flexibility for the candidate's start date, but it does not suggest that the University was not interested in filling the Robotics position. (*See* Add'l Fact No. 19.)

16. Plaintiff's CV identifies that he received his bachelor's degree from BYU and that he served as a "Full-time Volunteer Ecclesiastical Instructor, Ecuador" without identifying for which organization.

**Response:** Undisputed but incomplete. On summary judgment, the facts are construed in the light most favorable to the non-moving party, here Plaintiff. *Lazy S. Ranch Props., LLC v.*

---

[1] Defendant's Exhibits are referred to as "Def.'s App. Ex." and Plaintiff's Exhibits are referred to as "Pl.'s App. Ex."

*Valero Terminaling & Dist. Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). The reference in Plaintiff's CV to a "Full-time Volunteer Ecclesiastical Instructor, Ecuador" for a period of two years obviously refers to Plaintiff's religious missionary service for The Church of Jesus Christ of Latter-day Saints.

19. In subsequent scoring by the full search committee intended to determine which candidates would receive a preliminary Skype interview, Plaintiff was ranked among the top ten – in fifth place – with an average score of 3.8 on a ten-point scale (with low scores being better).

**Response:** Disputed. The ranking listed the candidates in a strict sequence by each search committee member. Though the average of the subjective "rankings" put Felt in fifth place, when judged against actual criteria, Felt scored equally with the top four other candidates, with the "best" possible score. (*See* Pl.'s App. Ex. A, UofU 000489–92.) Merryweather testified that "diversity" was weighed by the committee at this point in the decision process (Def.'s App. Ex. 6, Hearing Recording, 1.5.23 Day Three, Part 4 of 7, at 25min 55 sec.).

22. Based on the median scores and the ME department's interest in legged robotics, Plaintiff was ultimately ranked 6th out of the top ten applicants.

**Response:** Disputed. Felt and Candidate 5[2] both had the same average score of 5.2. Candidate 5 had individual scores of 5, 5, 6, 6, 4, while Felt had individual scores of 6, 6, 3, 5, 6.[3] (*See* Def.'s App. Ex. 15; Def.'s App. Ex. 18, p. 12 & n.20.) There is no explanation why the ME department chose to focus on median rather than average scores, and the manipulation of the

[2] In its Memorandum Decision and Order Denying Defendant's Motion for a Protective Order (ECF 43), the Court noted that "the use of names rather than anonymous identifiers may be less cumbersome for the litigants and the court."

[3] The document describing these scores has features that indicate such features may have been added *after* the Plaintiff filed his discrimination complaint with the University. The document's custodian could not certify that the document had not been modified in response to the investigation. (Def.'s App. Ex. 15; Abbott UALD Hearing Tr. 50:8-51:3 & 96:17-97:19.)

numbers to favor Candidate 5, a minority candidate with degrees from Iran, is probative of pretext. *See Walkingstick Dixon v. Oklahoma ex rel. Regional Univ. Sys. of Oklahoma Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025) ("Pretext can be inferred from evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation." (quotation simplified)).

23. On January 29, 2018, Dr. Ameel asked the search committee chair, Dr. Abbott, for a "short list of candidates for on-campus interviews" while recognizing that the search committee still had a few Skype interviews to conduct.

**Response:** Undisputed, but incomplete. Dr. Ameel also stated in an email to the search committee that they are looking to interview "5 or so" candidates. (Pl.'s App. Ex. Y, UofU 000302-00304.)

25. In his update, Dr. Abbott stated that each candidate was evaluated based on his or her "education (including fit to an M.E. department), research productivity (e.g., number and quality of publications), fit for a 'robotics' search, fit to the existing group (in terms of potential collaboration opportunities with the existing group and/or bringing something new to the existing group), and the quality of the teaching and research statements."

**Response:** Undisputed but incomplete. In his update, Abbott stated that based on the above criteria, the committee decided that "the top seven applicants are worthy of a potential invitation for an on-campus interview." (Def.'s App. Ex. 8, UofU 000303.) Felt was therefore deemed worthy of an on-campus interview based on the stated criteria in Abbott's update. (*Id.*)

28. The Faculty Search Update Form identified four of the top five candidates as "[s]till under consideration for an interview" because the search committee was still considering which of them to invite for an on-campus interview. Again, this list did not include Plaintiff.

**Response:** Disputed. Candidate 7, an Asian male, was ranked below Felt after the screening interviews, but Candidate 7 was nevertheless included in the Faculty Search Update Form identifying candidates under consideration for on-campus interviews. (*See* Def.'s App. Ex. 21, UofU 000308.) Despite being ranked higher by the search committee, Felt was not included on the Faculty Search Update Form. (*See id.*) And Felt had already likewise been found worthy of an on-campus interview. (Def.'s App. Ex. 8, UofU 000303.) But the Department Chair was unsure about submitting the name of a male candidate who did not have a justifiable "diversity status," which was required by the form. (*See* Def. App. Ex. 29, UofU030877 ("We only approved [female candidate] because … [Ameel] was not sure about [the Caucasian male candidate].").) The University asked the ME Department to remove the names of several male candidates, leaving only a single female "finalist." (*See* Def. App. Ex. 27, UofU 000318–321; Def. App. Ex. 29, UofU030877.)

29. As identified in an email from Dr. Abbott to the search committee on February 1, 2018, Dr. Abbott wanted to move ahead with inviting their top candidate, Candidate 1, for an on-campus interview because regardless of the outcome of any pending interviews, she would be in their top three.

**Response:** Disputed. See response to Fact No. 28.

30. After updating the Faculty Search Update form to identify only the one candidate that was officially ready for approval, the approval was granted.

**Response:** Disputed. See response to Fact No. 28.

33. While identifying that Candidate 1 may be best suited to teach DEMS related classes, the search committee believed she was a good fit for the Robotics group in terms of her research.

**Response:** Disputed. On the Faculty Search Update form, dated February 8, 2018, the University noted that Candidate 1, identified as a "Caucasian female," was "a better fit to the DEMS division than the Robotics division, but would still strengthen and expand the Robotics group at Utah." (Def. App. Ex. 30, UofU 000025.) Candidate 2, a "Caucasian male," was also found to be a better "fit to the DEMS division," but it was "less clear if he would strengthen the ***visibility*** of Robotics at Utah." (*Id.*) Thus, in comparing male and female candidates, the University was concerned with "visibility," which is coded language for diversity characteristics. *See Lazy S. Ranch*, 92 F.4th at 1198. Thus, Felt disputes that Candidate 1 was deemed a good fit based on her research as opposed to her sex.

34. After completing Skype interviews and further deliberation, the search committee sought permission on February 8, 2018, to bring an additional three (3) candidates for on-campus interviews, including one white male and two Asian males, from the list of those who had been previously identified as "[s]till under consideration for an interview", which did not include Plaintiff.

**Response:** Disputed. Two of the four candidates were deemed a "better fit to the DEMS division than the Robotics division. (Def.'s App. Ex. 30, UofU 000025.) Meanwhile, Felt was specifically found to be a "[g]ood fit for our [Robotics] group, with opportunities for collaboration." (Pl.'s App. Ex. A, UofU 000489.) Despite this, he was not included in the list for on-campus interviews because he would not have helped the "visibility" of the faculty search or the ME department.

In addition, the Faculty Search Update form specifically states, "We plan to invite additional final candidates but need to invite those listed above so we can be competitive in a time-sensitive market. We will submit a revised form when we have more final candidates …." (Def.'s

App. Ex. 30, UofU 000025.) Abbott replied to an inquiry from Felt on February 20, 2018 assuring him that he "[had] not been eliminated." (Pl.'s App. Ex. MM,[234] February 20, 2018 email, Faculty Candidacy Update.) Meek testified that that Felt would have been invited if additional invitations had occurred. (Def.'s App. Ex. 12, Meek Dep. 62:20–63:12.) Within a few weeks, only one of the four approved candidates was given an on-campus interview for the Robotics search. (Pl.'s App. Ex. B, UofU 007048; Pl.'s App. Ex. C, UofU 004530-32; Def.'s App. Ex. 4, UofU 000044.) Interviewing only a single candidate is said to "never" happen and is not considered strategic in terms of successfully filling an open position. (Def.'s App. Ex. 13, Mascaro Dep. 37:21–38:6; Def.'s App. Ex. 11, Abbott Dep. 37:17–38:15.) A faculty search committee member requested that Felt be interviewed. (Pl.'s App. Ex. D, UofU 000165; Def.'s App. Ex. 24, Merryweather Dep. 84:2–20.) Inviting Felt, however, would have required the ME Department to subject itself to administrative scrutiny for requesting the interview of a "Caucasian Male," without desirable "diversity status." (Pl.'s App. Ex. E, [092-99] Condensed Matter Theory Search; Pl.'s App. Ex. F, [143-144] RE_Search Updates PRN0161CF.)

46. Candidate 2 had not yet had his on-campus interview, which was scheduled for April 2nd and 3rd and he was seen as a potential "Opportunity Hire" that could be hired in addition to or for the posted Robotics Position.

**Response:** Disputed. Candidate 2, the only Caucasian male approved for an interview, was ultimately not invited on-campus for an interview as part of the official Robotics position search. (Def.'s App. Ex. 41, UofU 000557–58; Def.'s App. Ex. 4, UofU 000044.) According to Def.'s App. Ex. 41, Candidate 2 "does not fit his Robotics search, but could be an opportunity hire" and that his hire date "may be another year out." (*Id.*)

48. The update stated that the search committee unanimously found Candidates 1, 3, and 4, "substantially stronger then the next-best candidates, in terms of accomplishments and fit to our group's needs." The summary further stated that the search committee's "recommendation is to make an offer to Candidate 4 now, at the Assistant Professor level, and only consider bringing in additional candidates in the event that Candidate 4 declines our offer."

**Response:** Disputed. Felt disputes that Candidates 1, 3, and 4 were actually "substantially stronger th[a]n the next best candidates." In the initial rankings, two of the five search committee members ranked Candidate 4 below both Felt and Candidate 5; one ranked Felt above Candidates 2, 4, and 5. (Def.'s App. Ex. 15, UofU 000838.) Abbott also admitted that he did not consider Felt "less qualified" than the top-ranked candidate. (Def.'s App. Ex. 11, Abbott Dep. 94:19–25.)

49. This information was shared in an ME faculty meeting on March 16, 2018, and Dr. Ameel added that the ME Department was "trying to get the very best, which [Candidate 4] is and we should move forward in making the offer."

**Response:** Disputed and incomplete. Felt disputes that his qualifications were not comparable to Candidate 4 or that the Department felt that Candidate 4 was the "very best." (*See* Def.'s App. Ex. 11, Abbott Dep. 94:19-25; *see supra* Response to Fact No. 48.) Ameel testified that he was "aware of anything that rendered Dr. Felt… less desirable than [the top-ranked female Candidate 1] for an on-campus interview." (Ameel UALD Hearing Tr. at 97:16-23.) As set forth above, the ME Department's standard practice was to interview multiple candidates, not just one, and vote on the sequence in which to extend offers to candidates.(Def.'s App. Ex. 30, UofU 000025; Def.'s App. Ex. 13, Mascaro Dep. 37:21-38:6; Def.'s App. Ex. 11, Abbott Dep. 37:17-38:15; *see supra* Response to ¶ 34.) Ameel affirmed that that they "wanted more than one candidate to interview on campus...to ensure [they] were doing [their] due diligence," testifying

that interviewing multiple candidates allowed them "to find the very best of [their] applicant pool." (Ameel UALD Hearing Tr. 10:17-23.)

Further, extending an offer to Candidate 4 did not preclude the department from interviewing Felt. Having interviewed only one was specifically called out in an email from a concerned member of the search committee. (Pl.'s App. Ex. D, UofU 000165, "[if] we were convinced that [Candidate 4] was a sure thing, then maybe we wouldn't need to interview more at this point. … Felt would **next** be on my list of candidates I'd like to see.", emphasis added). For comparison, in a parallel search, the department sought permission to make two *contemporaneous* offers so that it could have a chance at hiring a female candidate. (*See* Add'l Fact No. 39.)

60. Dr. Abbott reached out to the current and incoming chairs of the ME Department to let them know that Candidate 2 indicated he may reach out at the start of Fall.

**Response:** Undisputed but irrelevant. Candidate 2 was being considered as an "opportunity hire" as he was tenured, not as part of the ordinary recruitment process. *See* response to Fact No. 46. Notably, there is no mention of Candidate 2 in the documents discussing whether an offer should be extended to Candidate 4. (*E.g.*, Def.'s App. Ex. 42, UofU 000594-000603). As such, the pursuit of Candidate 2 did not preclude the department from interviewing Felt.

61. On June 19, 2018, Dr. Abbott sent an email to the search committee asking if they approved pursuing Candidate 2, with a recommendation that they make him an offer "using [the open Robotics search] (to which [Candidate 2] applied)."

**Response:** Disputed. Abbott knew that Candidate 2 had effectively withdrawn his candidacy just two weeks earlier (Def.'s App. Ex. 46, UofU 000056). Abbott claimed he was making the recommendation at the request of the Department Chair "Tim [Ameel]." (Def.'s App.

Ex. 52, UofU 000056.) However, in Ameel's testimony, he vehemently denied Abbott's claim that he had made such a request. (Pl.'s App. Ex. YY Dep. of Tim Ameel, at 82:17-19). Felt had sent a follow-up email to the members of the Robotics group early *that same morning June 19, 2018*, emphasizing his qualifications and that he remained eager to be interviewed. (Pl.'s App. Ex. RR, [216] June 19 2018 email to search committee chair with updated CV.)

Abbott was unsure how to justify their failure to interview Felt without their purported pursuit of another candidate to justify the adverse treatment. (Pl.'s App. Ex. SS ("Can we come up with a unified message? Since we haven't hired anybody, it's not clear to me how to proceed.")) Abbott had already claimed that their failure to interview Felt was because they were "actively pursuing" another candidate. (Pl.'s App. Ex. SS, UofU030761-UofU030764.) But Abbott's testimony makes clear that the purported pursuit of Candidate 2 would not, in fact, have precluded them from interviewing (or hiring) Felt (Pl.'s App. Ex.TT, Abbott Hearing Tr. Jan. 4, 2023, 167:10-18.) *See Flitton v. Primary Residential Mort., Inc.*, 614 F.3d 1173, 1177 (10th Cir. 2010) ("Evidence that the employer's stated reason for the adverse employment action was false or contradictory can support an inference of pretext.")

64. While a "failed" or "unsuccessful" search is often seen as unfavorable, it was not something unusual and it was preferred to hiring a candidate that people were not excited about.

**Response:** Disputed. Felt was specifically found to be a "[g]ood fit for [the Robotics] group, with opportunities for collaboration." (Pl.'s App. Ex. A, UofU 000489.) Despite this, he was not included in the list for on-campus interviews because he would not have helped the "visibility" of the faculty search or the ME department. It was Felt's protected characteristics that led to the lack of excitement. *See also* response to Fact No. 34 in further response to this purported fact.

Member of the faculty search committee requested that Felt be interviewed. (Pl.'s App. Ex. D, UofU 000165; Def.'s App. Ex. 24, Merryweather Dep. 84:2–20.) Thus, accepting a "failed" search instead of bringing Felt on for an on-campus interview is evidence of discrimination.

68. After Plaintiff's initial Skype interview, Plaintiff sent a series of unsolicited emails to Dr. Abbott, search committee members, ME Department members, the Chairs of the Department, and HR, among other University departments.

**Response:** Undisputed but object to the characterization of the emails as "unsolicited."

70. Each search committee member testified that Plaintiff's characteristics of gender, race, religion, and national origin played no role in their decision not to recommend Plaintiff for an on-campus interview.

**Response:** Disputed. While the search committee members may have testified as they did, Felt disputes the credibility of the testimony in light of the surrounding facts. The credibility of the committee members is to be assessed by the fact-finder. Moreover, at least two committee members testified that the committee members took protected characteristics into account in hiring decisions, with Meek noting that engineering had been "dominated" by European males "for decades." (Def.'s App. Ex. 12, Meek Dep. 30:23–34:4; Def.'s App. Ex. 24, Merryweather Dep. 39:19–22 ("Q. Do you personally consider improving the diversity of the department when you are looking at candidates to fill the various positions? A. It is a consideration, yes.").

71. Search committee members testified that a general lack of excitement about Plaintiff and his work along with a poor fit were why they did not pursue him any further as a candidate.

**Response:** Disputed. See response to Fact No. 70. *Cf. George v. Youngstown State Univ.*, 966 F.3d 446, 466 (6th 2020) (noting that "subjective reasons provide ready mechanisms for discrimination").

72. Every faculty member within the College of Engineering questioned testified under oath that neither the University nor the College exerted pressure to hire individuals based on any protected status such as gender, race, religion, or national origin.

**Response:** Disputed. As shown in the Statement of Additional Facts ("Additional Facts"), the University had a Faculty Hiring Initiative to pressure and coerce departments to make diversity hires. (*See* Add'l. Fact Nos. 1-8.)

73. Multiple members of the search committee testified that the University's "Faculty Hiring Initiative" (the "FHI") was not a consideration in their decision not to invite Plaintiff to an on-campus interview or not to hire Plaintiff.

**Response:** Disputed. A jury could conclude based on the facts and circumstances that the ME Department's relative excitement for Candidate 1 and Candidate 4, who would be eligible for FHI funding, compared to Felt, who would not be eligible, evinces the FHI's effect on hiring decisions. (*See* Add'l. Fact Nos. 1-8.)

74. The FHI was intended to increase the number of applications from underrepresented groups for faculty candidates that applied for open positions by increasing the diversity of the pool of applicants.

**Response:** Disputed. The University did not measure success for its diversity programs in terms of achieving a "diverse" applicant pool, but by actually ***making "diverse" hires***. (Def.'s App. Ex. 60, Bond-Stockton Dep. 49:25–51:15.) In 2019, the University's Office for Equity and Diversity reported that in the past five years it ***increased faculty diversity*** from 13% to 23% and

that was in part due to the FHI. (*Id.*; *see also id.* at 51:5–7 ("Well, since the initiative was to increase diversity, I was always pleased if diversity was increased, since that was—that was the plan."))

75. FHI funding was not guaranteed and could only be applied for after making an offer of employment.

**Response:** Disputed. Even if FHI funding was not guaranteed, it was categorically not available to a non-diverse candidate like Felt. *See* Def.'s App. Ex. 12, Meek Dep. 30:23–31:21 (stating that the funding was for someone in an underrepresented group and that Felt would not be eligible for such diversity funding).

76. Dean Brown testified that the funding from FHI was insignificant compared to their budget and that he never made a hiring decision based on the availability of such funds.

**Response:** Disputed. Brown testified of "overt encouragement" from the University to hire diverse candidates, and that such "overt encouragement included the FHI. Brown testified that there were people in the diversity office who were "more aggressive with regard to diversity," and that both he as the dean and that others in the ME Department were aware of the diversity office's aggressive approach to diversity. (Pl.'s App. Ex. 62, Hearing at 42:20–43:55.)

In addition, the ME Department's 2015–2020 Strategic Plan shows that the ME Department took diversity funding into account when determining how many new faculty members it could hire. (*See* Add'l. Fact No. 11.)

77. Dr. Ameel, testified that he did not consider the availability of FHI funding as a factor in whether to hire an individual, nor did he ever promote a candidate in order to receive such fundings.

**Response:** Disputed. Ameel testified that diversity funding made it "possible" to hire diverse candidates that the department would not otherwise be able to hire. (*See* Pl.'s App. Ex. G, Hearing 1.3.23 Part 5 at 36:08–37:32.) As noted, the ME Department's 2015–2020 Strategic Plan shows that the ME Department took diversity funding into account when determining how many new faculty members it could hire. (*See* Add'l. Fact No. 11.)

78. The top priority in hiring is to hire the best candidate regardless of their protected characteristics.

**Response:** Disputed. It is incorrect that the ME Department hired the best candidate regardless of protected characteristics. When Felt was the best candidate, he was not even given an on-campus interview. Dr. Merryweather testified that the department considered minority status. (Def.'s App. Ex. 24, Merryweather Dep. 39:18–40:4, 43:5–17; Def.'s App. Ex. 3., Hearing Recording, 1.5.23 Day Three 4 of 7, at 25min 55 sec.) As discussed below in the Additional Facts, the ME Department was looking to hire women and other minorities and were incentivized to do so by the FHI. (*See* Add'l. Fact Nos. 9-41.)

80. Plaintiff refused to accept Dr. Gale's word that the search was over, and reached out to Trina Rich, Director of Administration in the Office of the Associate Vice President for Faculty, asking her to confirm if the search was "officially closed."

**Response:** Undisputed but object to the characterization that Felt "refused to accept Dr. Gale's word." Felt merely sought confirmation that the search was in fact closed.

82. Many members of the search committee and the ME Department found Plaintiff's aggressive outreach unusual and off-putting.

**Response:** Objection, irrelevant and immaterial to the ME Department's treatment of Felt during the search process.

83. Plaintiff's outreach did not cease, leading the University to seek a restraining order which was granted in part by this Court.

**Response:** Incomplete. The Court entered a protective order prohibiting Felt from speaking to witnesses in the case but denied the University's overbroad attempt to silence Felt and prevent him from discussing his unlawful treatment by the University. (Mem. Decision & Order, ECF No. 31.) (Dkt. No. 43)

85. None of the universities Plaintiff applied to made him an offer of employment.

**Response:** Undisputed but incomplete The search committee at the University of Utah was aware that the ME Department at Vanderbilt University had contemporaneously found Felt to be highly qualified and, consequently, had sought special permission to hire him. (*See* Pl.'s App. Ex. UU, [049] Forwarded letter from Vanderbilt, noting Vanderbilt's assessment of "[Felt]'s positive and friendly demeanor, creativity and collegiality, and it's clear… [he is] ready to start a faculty position."; Pl.'s App. Ex. WW , Update email to UofU April 22, 2018, "the [Vanderbilt] search committee and faculty uniformly felt you would be a great addition to our department.")

86. Since 2010 the ME Department has hired thirty-two (32) new faculty members.

**Response:** Undisputed but irrelevant.

87. Of those thirty-two (32) hires, six (6) were female.

**Response:** Undisputed but incomplete and irrelevant.

88. Twenty (20) of the hires identify as "White" and eleven (11) identify as "Asian" with one (1) choosing not to disclose.

**Response:** Undisputed but incomplete and irrelevant.

89. All new hires to the Robotics Center since 2010 are male, with two (2) identifying as "White" and two (2) identifying as "Asian."

**Response:** Undisputed but incomplete and irrelevant.

90. The demographic reports from all positions posted from the ME Department since the implementation of the PeopleAdmin software in 2011 indicate the following:

a. Four thousand one-hundred and three applications (4,103) were submitted for thirty (30) different postings.

i. Of those applicants fifteen hundred and forty-five (1,545) identified as "White" and two-thousand one hundred and thirteen (2,113) identified as "Asian" with the remaining identifying as other categories or not identified.

ii. Three-hundred and sixty-five (365) applicants identified as "Female" and three-thousand three-hundred and sixty-nine (3,369) identified as "Male" with the remaining not identified.

**Response:** Undisputed but incomplete and irrelevant.

95. At the conclusion of the Plaintiff's case, the Defendant moved for a directed verdict which was granted.

**Response:** Objection, misleading and irrelevant. The adjudicative proceedings before the Utah Labor Commission have no preclusive effect here.

96. Plaintiff appealed that finding to the Commissioner of the Utah Labor Commission who upheld the directed verdict.

**Response:** Objection, misleading and irrelevant. The adjudicative proceedings before the Utah Labor Commission have no preclusive effect here.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

### I. The Faculty Hiring Initiative

1. During her time as the University's Senior Vice President of Academic Affairs ("SVPAA") and later as the University President, Dr. Ruth Watkins implemented diversity hiring initiatives at the University, as reflected in the "University of Utah Strategic Goals." (Pl.'s App. Ex. WW, [064] UofU Presidential Goals 10-24-2018.) Those goals include a charge to "[i]ncrease diversity of faculty, including women in science and engineering." (*Id.*) According to Dr. Watkins, the University President at the relevant time, testified the phrase "increase the diversity" refers to protected racial and gender characteristics." (Def.'s App. Ex. 59, Watkins Dep. 28:2–29:1.)

2. Increasing diversity had been a top goal of the "University Strategy" since at least 2015. (https://web.archive.org/web/*/https://president.utah.edu/universitystrategy/.)

3. The University implemented financial incentives to achieve these goals in the University-wide "Faculty Hiring Initiative" ("FHI"). (Pl.'s App. Ex. H, UofU000246–47.) Starting in 2014, "[w]hen a scholar-teacher from an underrepresented group is the top candidate in an approved faculty search process, campus resources for salary support, up to 75K/year, will be available." (*Id.*) That number is reduced to "40k/year" if the faculty candidate "from an underrepresented group" is the "desired second candidate in an approved faculty search process." (*Id.*)

4. The program description further states that, to oversee faculty searches, OED "will monitor the outcome of the search, indicate the financial commitment, and assist with recruitment efforts." (Pl.'s App Ex. H, UofU000246–47.)

5. The FHI was designed to change the protected characteristics of the faculty candidates that were interviewed and hired by the Colleges and their respective departments. (Def.'s App. Ex. 60, Bond-Stockton Dep. 13:7–17, 51:2–15; Def.'s App. Ex. 59, Watkins Dep.

49:11–21.) The FHI had at least two primary inducements: (i) by awarding or withholding salary funds from the colleges/departments on the basis of protected characteristics of the candidates selected for hire; and (ii) by "signal[ing]" to "the individual colleges and departments that the university was serious about diversity hiring." (Def[.'s App. Ex. 60, Bond-Stockton Dep. 32:2–6.)

6. The hiring of a "Caucasian male" candidate, like Felt, who did not fall into some desired "category of diversity," was ineligible to be supported by the program's funds. (Pl.'s App. Ex. H, UofU000246–47; Def.'s App. Ex. 60, Bond-Stockton Dep. 40:4–12, 41:21–42:8.)

7. The University credited the FHI as being highly influential in its effect on hiring decisions: "Through the Faculty Hiring Initiative, beginning in 2014, we have increased the total number of faculty from underrepresented groups by 27%, with domestic faculty of color growing from 13% to 23% of the total faculty body. We have crafted a complementary staff hiring initiative to accelerate hiring of staff from diverse backgrounds." (Pl.'s App. Ex. I, [077] Diversity Equity & Inclusion at the U, University GRAMA R000621-050119, Appeal responsive records 000004–9, at 000006.)

8. The FHI was in place in the 2017–2018 academic year and funds were available for the position to which Felt applied. (*See* Def.'s App. Ex. 60, Bond-Stockton Dep. 35:16–36:1.)

**A. The ME Department Intentionally Made Diversity Hires**

9. Dr. Tim Ameel, the ME Department Chair, and the search committee members were aware of the availability of the "diversity funding" for the Robotics search. (Def.'s App. Ex. 35, Ameel Dep. 37:18–21; Def,'s App. Ex. 11, Abbott Dep. 68:7–17, 69:13–20, 69:25–70:6; Def.'s App. Ex. 13, Mascaro Dep. 107:24–108:2; Def.'s App. Ex. 12, Meek Dep. 26:4–10.) Ameel stated that the diversity funds were a means to "augment an offer," for a diversity candidate to "increase the probability that the individual would accept the offer." (Def.'s App. Ex. 35, Ameel Dep. 36:16–23.) Ameel later testified that these funds made it "possible" to hire diverse candidates that might

not otherwise be hired. (*See* Pl.'s App. Ex. G, Hearing 1.3.23 Part 5 at 36:08–37:32.) Ameel believed that to secure the diversity funds for a particular hire, the candidate had to be their top-rated candidate. (Def.'s App. Ex. 35, Ameel Dep. 34:18–36:9.)

10. But the FHI was discussed during ME Department faculty meetings, recording that it was for "any minority hire." (Pl.'s App. Ex. J, [079] FacultyMtgMinJan_14_15.)

11. Similarly, the ME Department's 2015–2020 Strategic Plan shows that the department took "diversity funding" into account when calculating how many new faculty members it could hire. (Pl.'s App. Ex. K, [080, 156] Strategic Plan 2015–2020.) The department effectively constrained itself before the searches were conducted to hire candidates that would qualify for the incentive funds. (*Id.*)

12. The ME Department then implemented that strategy. The new ME Department Chair, Dr. Bruce Gale, admitted that for the department to obtain the diversity funding they were planning on, "one of the individuals [hired] would need to be diverse." (Def.'s App. Ex. 39, Gale Dep. 71:21–72:9.)

13. As part of their preparation for the Robotics search in the Fall of 2017, the Faculty Search Committee ("FSC") was charged to "look for" "diversity hires." (Pl.'s App. Ex. L, UofU 000762-67.) Ameel testified that a "diversity hire" included "female candidates." (Def.'s App. Ex. 35, Ameel Dep. 39:17-21.) This was confirmed by Merryweather who admitted that the University and the ME Department wanted to hire candidates that were women or racial minorities. (Def.'s App. Ex. 24, Merryweather Dep.43:5-17; *see also id.* at 39:18-40:4.)

14. The Dean of the College of Engineering, Dr. Brown, admitted that the ME Department was under "pressure" to increase the number of women and minority candidates hired. (Def.'s App. Ex. 38, Brown Dep. 41:8-18, 54:14-56:8.)

15. University records indicate that "[a]ll colleges [are] required to craft diversity action plans (to be tied to their budget requests)." (Pl.'s App. Ex. M, [070a, 295] University GRAMA R000621- 050119, Appeal responsive records 000050-51; Pl.'s App. Ex. N, [070b, 076] University GRAMA R000621-050119, Appeal responsive records 000010-13.) To that end, University Deans were asked to describe how they "have allocated funds to create incentives for diversity hiring." (Pl.'s App. Ex. O, [071] SVPAA-Budget-Guidelines-FY19-20-1.)

16. In accordance with directives from the University administration, the College of Engineering "established diversity hiring procedures." (Pl.'s App. Ex. P, [126, 297] UofU COE 2019-2020 Budget Narrative). These "established procedures" include provisions to "get more minority and women candidates into the hiring pool and give qualified candidates a chance to interview." (*Id.*, Part A: Summary of Strategic Plan, Faculty and Staff Diversity).

***The Pool of Candidates Brought On-Campus for Interviews had to be Sufficiently Diverse***

17. As an additional measure to increase the diversity of faculty hires at the University, the University required that interview pools be reviewed and approved to ensure sufficient diversity in the candidates being considered for hire. (*See, e.g.*, Pl.'s App. Ex. E, [092-99] Condensed Mattery Theory Search; Pl.'s App. Ex. F, [143-144] RE_ Search Updates PRN0161CF.)

18. Departments were required to submit Faculty Search Update forms that report the diversity of the candidates that departments want to bring on-campus for interviews to ensure that minority candidates are considered. (Def.'s App. Ex. 38, Brown Dep. at 32:13-33:8.)

***The Relevant Robotics Position Search***

19. At the end of 2017, the ME Department determined that it would conduct a search for a tenure-track professor in the robotics area and posted a position designated "open-until-

filled" (the "Robotics Position"). (Pl.'s App. Ex. Q, UofU 000773; Pl.'s App. Ex. R, UofU 000001-42.)

20. The "Faculty search wish list" that led to the creation of the position stated, under "Robotics," "Specific areas are legged robotics, soft robotics, and medical robotics." (Pl.'s App. Ex. S, UofU 000657-59). It was labeled as, "Robotics – legged robotics, soft robotics, medical robotics" and then presented to and approved by the departmental faculty, including each member of the FSC shortly before the position was opened. (Pl.'s App. Ex. T, UofU 000697-740; *see also* Pl.'s App. Ex. U, UofU 000771-72.) The robotic search's "preferred emphasis on soft robotics, medical robotics, or legged robotics" was again prominent in the official request from the Department Chair to the College Dean, requesting permission to open the search (Def.'s App. Ex. 3, UofU000001-000002).

21. Felt's research area in "soft robotics" with medical applications was an excellent fit for the ME Department's Robotics Position search. Yet some search committee members sought to use Felt's research area as a pretext to justify the discriminatory treatment of him. Meek admitted that Felt's "area of work was kind of – kind of soft robotics" but claimed that "wasn't something that [they] were looking for." (Def.'s App. Ex. 12, Meek Dep. 83:3-9.) Lenzi agreed that Felt's work was in soft robotics with medical applications but then flatly claimed that these were not "research areas that the department was interested in hiring a candidate in." (Def.'s App. Ex. 5, Lenzi Dep. 78:1-24).

22. Felt applied for the Robotics Position. (Pl.'s App. Ex. V, UofU 000472.)

23. The ME Department formed a Faculty Search Committee (the "FSC") to vet candidates for the Robotics Position. (Pl.'s App. Ex. W, UofU 000043-44.)

24. The FSC reviewed the applications and determined which candidates it would screen in a brief interview via Skype. Following the screening, the FSC determined that Felt was "worthy" of an on-campus interview and referred his name to the department for an invitation. (Def.'s App. Ex. 11, Abbott Dep. 49:2-50:8, 80:9-82:14; Def.'s App. Ex. 5, Lenzi Dep. at 83:7-16; Def.'s App. Ex. 12, Meek Dep. at 43:4-10 & 57:4-58:10; *see also* Pl.'s App. Ex. X, UofU 007049-007051; Pl.'s App. Ex. Y, UofU 000302-04.)

25. The ME Department Chair had requested "5 [(five)] or so" names from the FSC for on-campus interviews and, in response, had received seven (7), including Felt. (Pl.'s App. Ex. Y, UofU 000302-00304.) When the fifth-ranked candidate for the position was an Asian male (Candidate 7), the department listed five (5) names in a form requesting on-campus interviews, describing each candidate's perceived race and sex for the administration. (Pl.'s App. Ex. Z, UofU 000307- 000309.)

26. The search committee hoped that because their list was "quite diverse" they could avoid a "potential problem" with the administration (Pl.'s App. Ex. Y, UofU 000302). If the list was not "diverse" enough the ME Department risked administrative reprisals. (*See, e.g.*, Pl.'s App. Ex. E, [092-99] Condensed Mattery Theory Search; Pl.'s App. Ex. F, [143-144] RE_ Search Updates PRN0161CF.) Merryweather that the FSC weighed the "diversity" characteristics of the candidates "when asking for permission to conduct further interviews." (Def.'s App. Ex. 3., Hearing Recording, 1.5.23 Day Three 4 of 7, at 25min 55 sec.)

27. Though the criteria claimed that "fit for a 'robotics' search" was an important criterion, the FSC ranked the female Candidate 1, above every male candidate from the screening interviews. This was done despite the fact that the FSC notes report she was a "better fit to [another

departmental division] than the Robotics division." (Pl.'s App. Ex. Y, UofU 000303). If she were hired, she would have qualified for FHI incentive funds as a female. (See Add'l Facts Nos. 3 & 9.)

28. Though the initial form included five (5) names, including male candidates, the Department Chair was unsure about submitting the name of a male candidate who did not have a justifiable "diversity status," which was required by the form (Def. App. Ex. 29, UofU030877 ("We only approved [female candidate] because … [Ameel] was not sure about [the Caucasian male candidate].")) The Department was required by the College to remove the names of the male candidates and advancing only the female Candidate 1 as the only finalist. (Pl.'s App. Ex. AA, Resp. to Pet'rs Initial Disc. Requests, Interrog. No. 6; Pl.'s App. Ex. BB, UofU 000319-000321.) The subsequent Department Chair later called this "special treatment." (Pl.'s App. Ex. CC, [164,192-199] What happened between Jan 30 and Feb 1st.)

29. Candidate 1 received this special treatment despite being objectively less qualified in terms of those objective credentials purportedly valued by the search committee. (Pl.'s App. Ex. DD, [165a, 167a] Comparison of Quantifiable Finalist Qualifications as of 10-8-2018.) She also lacked diversity in educational experience—her BS, MS, PhD and Postdoc were all from the same, school. (*Id.*) The other top candidates, including Felt, attended more highly-ranked schools and had each attended multiple institutions. (*Id.*) Felt was also considered a better fit for the Robotics division. In addition, Felt had many more first-author publications and citations than Candidate 1. (*See* Def.'s App. Ex. 11, Abbott Dep. 91:10-92:23.) Yet despite her documented poor "fit" and objectively lower qualifications, the female candidate was the candidate most consistently highly ranked by the search committee, both before and after her screening interview. (Pet. App. Ex. EE, UofU 000838.) She was also invited on-campus for an interview, while Felt was not. (*See* Def.'s App. Ex. 11, Abbott Dep. 91:10-92:23; Pl.'s App. Ex. FF, [165b, 167b, 168, 169] Detailed

comparison.) The administration was so eager to approve Candidate 1, the only female qualifying for an interview, that it told the College and ME Department she had been approved even before it had received full written approval. Trying to justify the treatment of Candidate 1, the department chair repeatedly resorted to pretextual explanations (Def.'s App. Ex. 35, Ameel Dep. 96-101). Among many false claims, he said they knew she "already had already received an offer, and it was from Carnegie Mellon." This cannot be true. (Pl.'s App. Ex. W, UofU 000044; Pl.'s App. Ex. B, UofU 007048). Abbott made similar unsubstantiated claims, even saying she was a "hot commodity." (Def.'s App. Ex. 11, Abbott Dep. 64:11-65-19.)

30. After Candidate 1 had been invited and approved, Sara Baldwin told the College and the ME Department that Candidate 1 had been approved even before Sara had received written approval from Jenn Bangerter. (Pl.'s App. Ex. GG, UofU 000310-000311.)

31. After Candidate 1 had been invited and approved, the ME Department submitted another on-campus interview request that included the names of male candidates. (Pl.'s App. Ex. R, UofU 000023-000025.)

32. When the FSC had scored the 75+ applicants for the position, Felt received the "best" score possible, one (1) of only five (5) candidates to be given that score. (Pl.'s App. Ex. HH, UofU 000490-92.) Yet when the FSC ranked the candidates based on their "excitement" or "level of enthusiasm" about hiring each candidate, on average they ranked Felt as the fifth- highest-priority candidate before the screening interview. (Pl.'s App. Ex. EE, UofU 000838; Def.'s App. Ex. 24, Merryweather Dep. 86:21-87:3, 44:23-45:11.)

33. After the screening interviews, Felt was still the fifth highest-ranked candidate. (Pl.'s App. Ex. EE UofU 000838.) Felt was ranked above Candidate 5 after both Felt and Candidate 5 had been interviewed. (Pl.'s App. Ex. Y, UofU 000303-04; Pl.'s App. Ex. II, Merryweather

Interview Notes, Dep. Ex. 11). Before Candidate 7's screening interview even took place, the "Asian Male" had been listed above Felt. (Pl.'s App. Ex. Y, UofU 000303-04; Pl.'s App. Ex. II, Merryweather Interview Notes, Dep. Ex. 11; Pl.'s App. Ex. Z, UofU 000309; Pl.'s App. Ex. EE, UofU 000838.) After Candidate 7 was screened-out, Felt was the fifth highest-ranked candidate. (Def.'s App. Ex. 11, Abbott Dep. 39:2-40:9, 54:23-55:10.)

34. Though the first form submitted by the department had listed five names (the number of rows on the form), now that the "Caucasian male" Felt was the fifth-highest ranked candidate, only four names were submitted. (Pl.'s App. Ex. R, UofU 000023-000025.)

35. Of the four names for whom administrative approval was sought, three were from underrepresented groups. (Pl.'s App. Ex. R, UofU 000023-000025.) The only "Caucasian male" was a tenured professor at another University. (*Id.*) As a "Caucasian male," he would not help what the faculty search committee called the ME Department's "visibility." (*Id.*; *see also* Def.'s App. Ex. 13, Mascaro Dep. 116:6-24.) Candidate 2 was excluded from the Robotics search but later gave a seminar to the department as a potential "opportunity hire" outside of the open Robotics search. (Pl.'s App. Ex. JJ, UofU 006976; Pl.'s App. Ex. KK, UofU 000557-000558; Pl.'s App. Ex. LL, UofU 004645; Pl.'s App. Ex. W, UofU 000044.)

36. Felt was assured by the FSC chair that he had "not been eliminated" and the department affirmed to the administration that they "plan[ned] to invite additional final candidates." (Pl.'s App. Ex. MM, [234] February 20, 2018 email, Faculty Candidacy Update; Pl.'s App. Ex. R, UofU 000023-000025.)

37. But when all but one of the four on-campus-approved-candidates had withdrawn or been excluded without giving an on-campus interview, the University still refused to refer Felt for an on-campus interview, despite a direct request from a member of the Faculty Search Committee

(Pl.'s App. Ex. D, UofU 000165) and an established practice of "never" considering only one candidate on-campus for an open position for which there was a need. (Def.'s App. Ex. 13, Mascaro Dep. 37:21-38:6.)

38. Referring Felt for an interview would have required the ME Department to subject itself to administrative scrutiny for seeking approval for a "Caucasian male." (Pl.'s App. Ex. R, UofU 000024.) They had already triggered unwanted administrative scrutiny about the diversity of their "finalists" with another parallel search just a few weeks prior. (Pl.'s App. Ex. F, [143-144] RE_ Search Updates PRN0161CF.)

39. Also "negatively impact[ing]" Felt and the Robotics search (Def.'s App. Ex. 11, Abbott Dep. 78:2-10), the Chair over-committed the department's deficient hiring funds so that it could make another offer to a female candidate in a parallel search, potentially "sabotaging" "multiple hire opportunities" in the Robotics search. (Pl.'s App. Ex. NN, UofU 000584-585, UofU 000567; Pl.'s App. Ex. OO, UofU 000769.) The Chair was planning to "seek diversity funding" to help cover the anticipated shortfall (Pl.'s App. Ex. __, UofU 014453-014454).

40. In June 2018, the ME Department labelled Felt and Candidate 5 as "Not-Selected," but it failed to advise Felt contrary to policy. (Pl.'s App. Ex. V UofU 000472; Pl.'s App. Ex. PP [228] Hiring_Toolkit_Br_WEB, 27.) Candidate 5 was notified in accordance with the policy. (Pl.'s App. Ex. QQ, UofU 000471).

41. The ME Department purported to shut down the faculty robotics search that was conducted during the 2017–18 academic year. (Def.'s App. Ex. 11, Abbott Dep. 21:2-11; Def.'s App. Ex. 39, Gale Dep. 114:14-116:14; *see also* Def.'s App. Ex. 58, Minor Dep. 32:25-33:17.) The department started taking applications for the position again in the 2019-20 academic year.

(Def.'s App. Ex. 11, Abbott Dep. at 22:5-25.) The ME Department only made offers to (and hired) candidates with desired diversity characteristics.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"In resolving a motion for summary judgment, the court views 'the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party.'" *Shen Engineering, Inc. v. Brighton*, 748 F. Supp. 3d 1086, 1093 (D. Utah 2024) (quoting *Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008)). "Ultimately, a summary judgment determination depends on whether, given the evidence presented, 'a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.'" *Id.* (quoting *Anderson*, 477 U.S. at 254); *see also Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1543 (2025) (reversing summary judgment on plaintiff's "reverse discrimination" claims under Title VII); *Graham v. Bristol Hospice Holdings, Inc.*, No. 2:21-cv-00754-TS-DBP, 2024 WL 5119970, at *1 (D. Utah Dec. 16, 2024) (denying summary judgment in Title VII case because there were genuine disputes of material fact).

## ARGUMENT

The University's Motion must be denied because there are genuine issues of material fact regarding the University's claim that it did not unlawfully discriminate against Felt. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is also unlawful for the same protected characteristics to be a "motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m).

Here, Felt has direct evidence that the University discriminated against him based on protected characteristics by implementing the FHI to encourage hiring minorities and discourage hiring white males. Even without direct evidence of discrimination, however, Felt can establish a prima facie case under the *McDonnell Douglas* burden-shifting framework. And viewing the facts in the light most favorable to Felt, there is a genuine issue of fact regarding pretext. The University says it was "not excited" about him. But a reasonable jury could easily find that the University would have been excited if he were a woman or fit into some other desirable demographic box.

### I. Felt Has Direct Evidence of Discrimination Because the FHI Facially Discriminates Against White Males in Favor of Minority Candidates.

A plaintiff can prove a Title VII violation "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*." *McNellis v. Douglas County Sch. Dist.*, 116 F.4th 1122, 1137 (10th Cir. 2024) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). "Direct evidence" is "evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Id.* (quotation simplified). For example, "statements showing '***an existing policy which itself constitutes discrimination***' are direct evidence of discrimination." *Id.* (emphasis added) (quoting *Heim v. Utah*, 8 F.3d 1541, 1546

(10th Cir. 1993)). In contrast, statements expressing a "personal opinion," even if reflecting bias, are not direct evidence. *See Heim*, 8 F.3d at 1546–47.

In *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985), the Supreme Court held that there was direct evidence of discrimination where an employer's policy allowed female employees to make larger contributions to pension funds than male employees. *Id.* at 622. Because the policy was discriminatory "on its face," the *McDonnell Douglas* test was inapplicable and discrimination was established. *Id.*

Similarly, in *Bass v. Board of County Commissioners*, 256 F.3d 1095 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008), the court found a County's "affirmative action plans [to be] direct evidence of discrimination" under Title VII. *Id.* at 1109. As explained,

> …The mere existence of an affirmative action plan by itself does not constitute direct evidence of discrimination unless there is also evidence that the employer acted pursuant to the plan in making employment decisions.
>
> However, the existence of an affirmative action plan, when combined with evidence that the plan was followed in an employment decision, is sufficient to constitute direct evidence of unlawful discrimination …. Furthermore, ***even when a defendant denies having acted pursuant to its affirmative action plan, if there is evidence that it may have done so, a jury must decide whether the defendant in fact acted pursuant to its stated plan***. …

*Id.* at 1110 (emphasis added) (citations omitted).

Here, the FHI is an existing policy that discriminates on its face. The FHI uses financial incentives to promote the hiring of minority candidates over Caucasian males. While the FHI funds would have been available for Candidate 1 as a female—either to subsidize her cost to the ME Department or to increase her compensation—it is undisputed that the funds were not available for Felt. (Fact No. 75; Add'l Fact Nos. 3–6.) Like the pension plan in *Thurston*, the FHI benefits females over males and is facially discriminatory and direct evidence of discrimination.

The University argues that the FHI policy does not qualify as direct evidence because it "does not establish quotas, limits on hiring of certain categories, or set specific requirements based on protected characteristics." Mot. at 20, ECF 49. But after the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), that is irrelevant. The FHI facially discriminates based on protected characteristics and is invalid. "[R]egardless of good intentions, a government employer commits unlawful discrimination when it takes race [or other protected characteristics] into account in an employment decision and acts pursuant to an invalid affirmative action plan." *Bass*, 256 F.3d at 1110. That is what happened here.

The University also argues that the FHI "played no role in the decision not to invite Felt to an on-campus interview." (Mot. at 20–21, ECF 49.) But that strains credulity. Even if the University now denies that the FHI affected decision making, a jury does not have to believe that account. Search committee members testified that they took protected characteristics into account in hiring decisions because, in their view, males of European descent had "dominated" engineering for centuries. (Fact Nos. 70, 73.) Ameel testified at a hearing that FHI funds made it "possible" to hire diverse candidates. (Fact No. 77.) The ME Department's Strategic Plan took diversity funding into account when determining how many faculty members to hire. (Add'l Fact No. 11.) And the University touted the FHI's success in increasing faculty diversity from 13% to 23% since its inception. (Fact No. 74; Add'l Fact No. 7.) Based on these facts, a jury could conclude that the University "in fact acted pursuant to its stated plan" to increase diversity. *See Bass*, 256 F.3d at 1110.

In sum, the evidence shows that the University considered the FHI in its employment decisions relating to Felt. There is thus direct evidence of discrimination, and summary judgment for the University would be inappropriate.

## II. Felt Can Establish a Prima Facie Case of Discrimination.

### A. Felt Applied for An Open Position but Was Rejected Under Circumstances That Give Rise to an Inference of Discrimination.

Felt can also establish a prima facie case based on circumstantial evidence. In *McDonnell Douglas*, the Supreme Court "laid out a three-step burden-shifting framework for evaluating claims [under Title VII]." *Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1545 (2025). At the first step, "the plaintiff bears the 'initial burden' of 'establish a prima facie case' by producing enough evidence to support an inference of discriminatory motive." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff does so, the burden "shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, the plaintiff "must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Id.*

The first step of this framework—the prima facie case—is "not onerous." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).[4] In the failure to hire context, it merely requires the plaintiff to present evidence that "[he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* Stated differently, the plaintiff must show "(1) the plaintiff belongs to some protected class, (2) the plaintiff was qualified for the position or benefit

[4] In *Ames*, the Supreme Court rejected a "background circumstances" element in which "majority-group plaintiffs must satisfy a heightened burden to make out a prima facie case." 145 S. Ct. at 1546; *see also id.* at 1545 n.1. Such a "background circumstances" requirement "is not consistent with Title VII's text or [the Supreme Court's] case law construing the statute." *Id.* at 1543.

at issue, (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated less favorably than others ….” *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1134 (10th Cir. 2004); *see also Walkingstick Dixon v. Okohama ex rel. Regional Univ. Sys. of Oklahamoa Bd. of Regents*, 125 F.4th 1321, 1335 (10th Cir. 2025) (explaining the several "variations" of the prima facie test); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (noting a plaintiff is not required to show that the defendant hired someone outside the protected class). Felt satisfies these elements.

*First*, Felt belongs to multiple protected classes based on his race, religion, sex, and national origin. (Fact Nos. 13–16.) These protected characteristics were each known to the University. (*Id.*)

*Second,* it is undisputed that Felt was qualified for the position. The University acknowledges that he was rated a "strong" candidate based on his application. (Fact No. 18.) Indeed, he was initially ranked in the top five candidates, and when judged against the hiring criteria, Felt achieved a perfect score. (Fact No. 19.) Moreover, he was specifically found to be a "[g]ood fit for [the Robotics] group" given his specialty in soft robotics and potential for collaboration with other faculty. (Fact No. 34.) The search committee chair has further admitted that Felt was no less qualified than Candidate 1, the top-ranked candidate. (Fact No. 48.) He was also found "worthy" of an on-campus interview by the search committee. (Fact No. 25.)

*Third*, Felt suffered an adverse employment action when he was not given an on-campus interview or offered the open position. (Fact No. 63–4, 69.)

*Finally*, Felt was treated less favorably than others. Despite his comparable qualifications to other candidates, he was not even offered an on-campus interview. (Fact No. 69.) Felt was found to be a good fit, but he was not included in the list for on-campus interviews because the

ME Department was concerned about the "visibility" of the faculty search. (Fact No. 64.) The Faculty Search Update form stated that the ME Department "plan[ned] to invite additional final candidates." (*Id.*) And Meek testified that Felt would have been invited, while Merryweather specifically requested that Felt be interviewed. (*Id.*; Add'l Fact No. 36.) But the ME Department was required to submit Faculty Search Update forms to the University listing candidates' race and sex to obtain approval for on-campus interviews. (Add'l Fact No. 18.) The University could—and did—withhold approval if candidates were not sufficiently diverse. (Add'l Fact No. 38.) So the University closed the search after only one on-campus interview rather than submit Felt's name and his protected characteristics for University scrutiny. (*Id.; see also* Fact No. 64 (interviewing a single candidate is said never to happen).) This is sufficient to establish a prima facie case.

Yet there are still other circumstances that "give rise to an inference of unlawful discrimination." *Ames*, 145 S. Ct. at 1545. Even if it does not constitute direct evidence of discrimination, the FHI at least supports an inference that the University favored minority candidates over majority ones. At least two search committee members testified that the committee took protected characteristics into account in hiring decisions, with one noting that engineering had been "dominated" by European males "for decades." (Fact No. 70.) Merryweather testified that he personally considered "improving the diversity of the department" when looking at candidates. (*Id.*) Dean Brown further admitted that the ME Department was under pressure from the University to increase the diversity of its faculty. (Add'l Fact No. 14.) This pressure is evidenced by the fact that the University increased faculty diversity by 10% within 4 years. (Fact No. 74; Add'l Fact No. 7.) In sum, Felt can establish the "not onerous" burden of proving a prima facie case.

**B. The University's Contrary Arguments Are Unpersuasive.**

The University's arguments to the contrary have no merit. It first argues that there is no statistical evidence that the ME Department discriminates against White males and relies on *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006), for support. (Mot. at 21, ECF 49.) But *Argo* imposed a "background circumstances" requirement on the plaintiff that has since been overruled. *Id.* at 1201 (citing *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992)). This "background circumstances" requirement was rejected by the Supreme Court in *Ames* as inconsistent with Title VII's text and Supreme Court precedent. 145 S. Ct. at 1455–46 & n.1; *see supra* n.3. Thus, *Argo*'s discussion requiring statistical evidence of discrimination has been overruled and is unavailing. There is simply no requirement that a plaintiff introduce statistical evidence to meet his prima facie case of disparate treatment.

The University next argues that there is no evidence that Felt's religion played any role in the hiring committee's decision-making.[5] (Mot. at 24, ECF 49.) But viewing the facts most favorably to Felt, his CV informed the hiring committee of his missionary service for The Church of Jesus Christ of Latter-day Saints as well as his Bachelor's degree from Brigham Young University. Although the University argues that it did not know the religious affiliation of other candidates, at the prima facie stage, Felt only needs to show that others not sharing his protected characteristics were treated more favorably. Felt was the only top candidate whose religion was known to the search committee, and he was treated less favorably than comparably qualified candidates who were not known to share the same religious affiliation. That is sufficient.

The University finally argues that Felt cannot establish "that the position remained open or was filled by a person not of his protected classes." (Mot. at 24, ECF 49.) This contention both

[5] This argument is limited only to Felt's religious discrimination claim and does not address his other discrimination claims based on race, color, sex, or national origin.

ignores the facts and imposes an extra element not required at the prima facie stage. In *Kendrick*, the Tenth Circuit explained that a plaintiff is *not* required "to show that the defendant hired someone outside of the protected class in order to make out a prima facie case." 220 F.3d at 1226. Moreover, the facts show that after the ME Department refused to submit Felt's name for an on-campus interview, it continued to pursue other individuals outside of his protected classes. (Fact Nos. 27, 28, 34, 64.) The University tries to turn the fact that the search was closed into a get-out-jail-free card. But the fact that the University closed the search rather than extend an on-campus interview invitation to Felt *is* the evidence of discrimination. *Cf. Exum*, 389 F.3d at 1134 n.6 ("The precise articulation of what is required to establish a prima facie case may vary somewhat depending on the context of the plaintiff's claim.").

In sum, Felt has established a prima facie case of discrimination, and the University's arguments to the contrary are unpersuasive.

### III. Felt Can Establish Pretext, Or at the Least a Question of Fact for Trial.

The University states that the reason Felt was not hired was because "they were not excited about his research, his fit for the Department, and/or they were not impressed with [him] after his Skype interview." (Mot. at 25, ECF 49.) None of those explanations are true.

Pretext can be demonstrated with "evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation." *Walkingstick Dixon v. Oklahoma ex rel. Regional Univ. Sys. of Oklahoma Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025). But a plaintiff cannot "be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). The Tenth Circuit has also "definitively rejected a 'pretext plus' standard that requires a plaintiff to provide affirmative evidence of discrimination beyond the prima facie case." *Walkingstick Dixon*, 125 F.4th at 1337 (quotation simplified). That is, "the fact

of pretext alone may allow the inference of discrimination." *Id.* (quotation simplified) (holding that plaintiff provided sufficient evidence to permit a factfinder to rationally find the employer's proffered nondiscriminatory reasons "unworthy of credence").[6]

The Sixth Circuit's opinion in *George v. Youngstown State University*, 966 F.3d 446 (6th Cir. 2020), is instructive in highlighting that "subjective reasons provide ready mechanisms for discrimination" and must be carefully analyzed. *Id.* at 466. There, the plaintiff applied for a position as an Assistant Director of Research Services with Youngstown State University. The university rejected his application, claiming that he was "not impressive" in his video interview. *Id.* at 455. The university instead invited two applicants for in-person interviews, including the one who eventually got the job, a 34-year-old female. The university stated that it hired the female because of her experience with a software called "Moderas." But there were irregularities in the search process, including the search committee's failure to compare his experience to the successful candidate's as well as the speed in which the university pursued the younger candidate. *Id.*

The Sixth Circuit reversed summary judgment to the university because the plaintiff met his burden to show pretext. "While Defendants say the legitimate reason they did not hire [him] was that he was not impressive in his interview, [the plaintiff] offers several pieces of evidence that a reasonable juror could rely on to doubt this explanation." *Id.* at 466. First, the plaintiff had evidence suggesting "irregularities with the search process, which can raise a genuine issue of fact as to whether an employer's asserted reason is pretextual." *Id.* For example, the internal forms

---

[6] *See also Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1381 (10th Cir. 1994) (finding a genuine issue of material fact regarding whether a school district's proffered reason for termination was pretextual); *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875 (10th Cir. 2018) (concluding that employer's "proffered reason for terminating [the plaintiff] is too weak, implausible, inconsistent, incoherent, or contradictory to believe").

used by the university were not fully completed, and there was evidence that the successful candidate had "an inside track" as part of the interview process. In addition, the "Moderas" software that was apparently important in hiring the younger candidate was "never listed in the search qualifications … and was never actually implemented." *Id.*

Second, the plaintiff contested as a factual matter that he was "not impressive in his interview." *Id.* at 467. The court noted that "[s]uch subjective evaluations by the employer—at least where contested by the employee—require close examination because they have a greater susceptibility for being a smokescreen for pretext." *Id.* (citing *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext.'")).

That is all equally true here. As noted, the University offers three, closely related reasons why it declined to interview Felt on campus or hire him for the open position. All are pretextual.

*First*, the University states that the ME Department was "not excited about [Felt's] research." (Mot. at 25, ECF 49.) That contradicts the documentary evidence. The relevant job posting specifically stated that the ME Department was looking for someone with experience in "legged robotics, ***soft robotics, and medical robotics***." (Add'l Fact No. 20 (emphasis added).) And Felt's research is in "soft robotics" with medical applications. (Add'l Fact No. 21.) After Felt alleged discrimination, however, the search committee testified that Felt's focus on soft robotics was not "something that [they] were looking for." (Add's Fact No. 21.) This shifting explanation of what the ME Department was looking for is sufficient to establish pretext.

*Second*, the University states that the ME Department was "not excited about … [Felt's] fit for the Department." (Mot. at 25, ECF 49.) But the search committee's notes provide that Felt

was specifically found to be a "[g]ood fit for [the Robotics] group, with opportunities for collaboration." (Fact No. 34.) Meanwhile, Candidate 1 was ranked higher than Felt despite being deemed a better fit for another group outside of Robotics. (Fact No. 33.) The University was thus not concerned with so-called "fit" when it came to Candidate 1, a female candidate, but nevertheless uses it to justify its treatment of Felt, a male candidate who the search committee chair found no less qualified than Candidate 1. (Fact No. 48.) This inconsistency is again sufficient to establish pretext.

*Finally*, the University states that the ME Department was "not impressed with [Felt] after his Skype interview." (Mot. at 25, ECF 49.) As in *George*, that subjective assessment requires careful scrutiny. After the initial screening, Felt was ranked in the top five, scoring equally with the other top candidates. (Fact No. 19.) After his Skype interview, Felt was still deemed "worthy" of an on-campus interview based on his scores. (Fact No. 25.) Yet his name was never submitted for approval. (Fact No. 28.) The search committee was admittedly taking the diversity of the candidates into account when making these rankings. (Fact No. 26.) And there are several procedural irregularities that accompany that decision. The ME Department first sought approval for only a single female candidate, even though she was determined to be a better fit to a different group. (Fact Nos. 28, 33.) Candidate 1, moreover, had the "inside track," *see George*, 966 F.3d at 466, and received special treatment in the search process. (Add'l Fact Nos. 28–30.) The Faculty Search Update forms specifically provided that the ME Department intended "to invite additional final candidates," but it never invited Felt despite him being the highest-raked remaining finalist. (Fact No. 34.) In the end, only one person was ever brought on campus for an interview, a circumstance so out of line with the typical process that the search committee testified it "never" happened. (Fact No. 64.) If the University was not impressed with Felt after his interview, it could

and should have said so. It did not. (*See* Add'l Fact Nos. 36–40.) Again, this thin, subjective, and post-hoc explanation is sufficient to establish pretext.

Based on the facts, a reasonable jury could find the University's proffered nondiscriminatory reasons for its treatment of Felt "unworthy of credence." *Walkingstick Dixon*, 125 F.4th at 1388. Summary judgment to the University is therefore improper.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion should be denied.

Dated this 18th day of July 2024.

**KIRTON McCONKIE**

*/s/ Ryan B. Frazier*
Ryan B. Frazier
Jonathan Burt

Attorneys for Plaintiff

**WORD COUNT CERTIFICATION**

Pursuant to DUCivR 7-1(a)(4)(B)(i), I certify that the above PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT contains 11703 words of a 12,400 word limit, excluding the parts of the document exempted by DUCivR 7-1(a)(6). This certification was prepared in reliance on the word-count function of the word-processing system (Microsoft Word) used to prepare the document.

*/s/ Ryan B. Frazier*
Ryan B. Frazier
Jonathan Burt