**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| WYATT FELT,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF UTAH,<br><br>Defendant. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:24-cv-00063<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Wyatt Felt filed this action against Defendant University of Utah, alleging employment discrimination based on race, sex, religion, and national origin, in violation of Title VII of the Civil Rights Act of 1964. The University now moves for summary judgment. As explained below, the Court will grant the University's motion.

## BACKGROUND

The story for this case began over a decade ago when, as part of an effort to foster diversity on its campus, the University implemented a faculty hiring initiative (the "FHI").[1] The FHI was described as a "recruitment effort" to "increas[e] faculty from diverse racial-ethnic backgrounds," as well as "[f]emale faculty in fields where they are significantly underrepresented" and "faculty of other underrepresented identities."[2] Under the program, "salary support" funds were available over the course of "three to five years . . . to accelerate recruitment of faculty from diverse

[1] *See* Dkt. No. 55-8 at 2–3; *see also* Dkt. No. 49-60 at 9 (deposition testimony stating that the FHI was implemented in spring 2015). Dkt. No. 55-49 at 2 (listing "[i]ncreas[ing] diversity of faculty, including women in science and engineering," as one of the University's "strategic goals"). Pinpoint citations to documents in the record refer to the electronic page numbers generated by CM/ECF.

[2] Dkt. No. 55-8 at 2.

backgrounds."[3] For instance, "[w]hen a scholar-teacher from an underrepresented group [was] the top candidate in an approved faculty search process," the FHI provided for up to $75,000 per year in funding.[4] "When a scholar-teacher from an underrepresented group [was] a qualified and desired second candidate in an approved faculty search process," the FHI provided for up to $40,000 per year for three years.[5]

The University's Office of Equity and Diversity ("OED") was the steward of the FHI funds, and department chairs were encouraged to notify OED when someone from an underrepresented background was either the "first or second candidate" so that OED could "monitor the outcome of the search" and, as applicable, "indicate the financial commitment."[6] FHI funding was not guaranteed, however.[7] As former Assistant Vice President for Equity and Diversity, Kathryn Stockton, put it at a deposition, the University "asked departments to . . . hire [their] top candidate," i.e., the candidate who was "intellectually best for the description of the job," and notify OED of their decision, after which they "may or may not receive funding."[8] Moreover, FHI funding could not be added to the otherwise-applicable salary available for a position.[9]

---

[3] *Id.* The FHI "stopped being used" in spring 2018. Dkt. No. 49-60 at 6. It should also be noted here that Felt, in opposing the University's motion for summary judgment, points to certain other diversity initiatives as well, but those initiatives did not come into the picture until 2019, i.e., after Felt filed his charge of discrimination in this case. *See* Dkt. No. 49-65 at 2; Dkt. No. 55-13 at 2; Dkt. No. 55-14 at 3–4; Dkt. No. 55-15 at 6; Dkt. No. 55-16 at 2.

[4] Dkt. No. 55-8 at 2.

[5] *Id.* at 2–3.

[6] *Id.* at 3.

[7] *See id.* ("It is possible that the available funds will be expended during a hiring cycle, in which case not all requests will be able to be accommodated."); Dkt. No. 49-60 at 13 (deposition testimony stating that around 2017 or 2018, the University was "very aware . . . that there may be more people coming forward than [it could] fund").

[8] Dkt. No. 49-60 at 4, 13, 21.

[9] *Id.* at 10–11.

As an additional effort to promote diversity among its faculty, the University, during the period relevant to this case, required departments to fill out and submit a Faculty Search Update form before holding final interviews for open faculty positions.[10] This form was designed to "ensure that [the University has] made every effort to reach out and consider all candidates" without regard to protected characteristics such as race and gender because, as the form explained, "[c]onsideration of a broad and diverse faculty candidate pool is required to maintain excellence in research, education, and scholarship."[11] The form asked departments to "[d]escribe . . . efforts to recruit candidates into the search pool, including efforts to reach out to candidates who are underrepresented."[12] The form then asked for a description of the initial and final screening processes and provided space for "[n]arrative [i]nformation" about the candidates, including "**known** information about each candidate's diversity," while instructing departments not to "ask candidates for diversity information."[13] For the final group of candidates, the form directed departments to rank the candidates chosen for interviews.[14]

In July 2017, the Strategic Planning Committee of the University's Department of Mechanical Engineering met to discuss, among other things, upcoming faculty searches.[15] They decided to "offer three tenure-track faculty positions," including one with the department's robotics group.[16] The minutes from the meeting include a "Faculty Search Wish List," which, for the robotics group, noted that "there is considerable federal funding" available, specifically for

[10] *See* Dkt. No. 49-30 at 2; Dkt. No. 59-2 at 5.
[11] Dkt. No. 49-30 at 2.
[12] *Id.*
[13] *Id.* at 3–4.
[14] *Id.* at 3.
[15] Dkt. No. 55-19 at 2.
[16] *Id.* at 4.

"legged robotics, soft robotics, and medical robotics."[17] "Speaking more broadly," however, Jake Abbott, a member of the robotics group, "agreed that [the department] would like to hire the best person."[18] At a subsequent faculty retreat, Tim Ameel, who was then the department chair, gave a presentation that included "[f]urther discussion of hiring priorities" and highlighted the department's upcoming robotics search and its interest in "legged robotics, soft robotics, [and] medical robotics."[19]

In September 2017, Ameel sent a memorandum to Rich Brown, Dean of the College of Engineering, to ask for permission to open a search for the robotics group.[20] In the memo, Ameel indicated that the search would have "a preferred emphasis on soft robotics, medical robotics, or legged robotics" but also said that the department wished for the search to "be relatively broad in nature with the intent of hiring faculty members with the greatest potential to establish nationally recognized research programs."[21]

Brown approved the search, and the department subsequently posted a job listing for a tenure-track professorship in the robotics group.[22] The search committee established for the position consisted of Abbott, who was designated as the chair, along with Tommaso Lenzi, Stephen Mascaro, Sanford Meek, and Andrew Merryweather, all of whom were members of the robotics group, except for Merryweather, who was a member of the department's design, ergonomics, manufacturing, and systems division ("DEMS").[23]

---

[17] *Id.* at 3.
[18] *Id.*; *see also* Dkt. No. 49-8 at 4.
[19] Dkt. No. 55-20 at 2, 39, 44.
[20] Dkt. No. 55-21 at 2.
[21] *Id.* at 2–3.
[22] Dkt. No. 49-1 at 2; Dkt. No. 49-2 at 2.
[23] Dkt. No. 49-8 at 4.

The members of the search committee attended a workshop to discuss the recruitment process.[24] The minutes from this event emphasize that the "search should be looking for the best person rather than trying to fill a specific research niche."[25] The minutes also indicate that the search committee was encouraged to "[l]ook for . . . diversity hires" and "pay attention" to diversity "while still going for the best candidate."[26]

Felt applied for the position with the robotics group.[27] He indicated on his job application that he was a white male, and the curriculum vitae that he submitted with the application stated that he received a bachelor's degree from Brigham Young University and spent about two years as a "Full-time Volunteer Ecclesiastical Instructor" in Ecuador.[28]

The ensuing selection process began with "at least three members of the search committee" reviewing each of the applications received.[29] "Each applicant was given a score of 1, 2, or 3," with a score of 1 being the highest and an indicator that the candidate "should be at least discussed by the entire committee, and likely invited for a Skype interview."[30] During this initial screening process, Felt received a 1 from all members of the search committee who reviewed his application.[31] There were also several other candidates who received straight 1s, however.[32] In his notes on Felt's application, Abbott specifically expressed that Felt had an interest in "soft robotics"

---

[24] *See* Dkt. No. 55-12 at 2.
[25] *Id.* at 3.
[26] *Id.* at 7.
[27] Dkt. No. 49-9 at 2
[28] Dkt. No. 49-10 at 6–8. Felt's CV also included a headshot, in color, depicting a white male. *Id.* at 7.
[29] Dkt. No. 49-8 at 4.
[30] *Id.*
[31] Dkt. No. 49-14 at 2. Felt's application was initially reviewed by Abbott, Mascaro, and Meek. *Id.*
[32] *Id.* at 2–3.

and a "[g]ood publication record in good venues."[33] Abbott further noted that Felt would be a "[g]ood fit for [the] group" who would provide "opportunities for collaboration."[34]

Following this initial round of review, the search committee convened to make a list of candidates that they wished to interview over Skype.[35] During this process, the search committee chose ten candidates for Skype interviews and individually evaluated those candidates on a ten-point scale (with a score of 1 being the highest).[36] Felt was among those chosen for Skype interviews and had an average score of 3.8, which was fifth-best in the pool of evaluated candidates.[37]

Felt had his Skype interview on January 25, 2018.[38] Meek took notes during this interview and observed, among other things, that Felt's proposed areas for future research were "risky."[39] Following the Skype interview, all but one of the members of the search committee gave Felt a score on the ten-point scale that was lower than what he received in his pre-interview evaluation.[40] As a result, Felt's average score dropped to 5.2, placing him in a tie with another candidate ("Candidate 5") for fifth place on the search committee's rankings.[41]

On January 29, 2018, Ameel emailed Abbott, asking whether the search committee had "selected the short list of candidates for on-campus interviews."[42] Ameel acknowledged that the search committee still had to conduct two more Skype interviews but expressed a desire to "get[]

---

[33] *Id.* at 2.
[34] *Id.*
[35] Dkt. No. 49-8 at 4; Dkt. No. 49-15 at 2.
[36] Dkt. No. 49-15 at 2.
[37] *Id.*; *see also* Dkt. No. 49-16 at 3–4.
[38] *See* Dkt. No. 49-16 at 2–3.
[39] Dkt. No. 49-17 at 2.
[40] *See* Dkt. No. 49-15 at 2.
[41] *See id.*
[42] Dkt. No. 49-19 at 2.

5 or so candidates together" to facilitate "administration approval."[43] In a response where he copied the rest of the search committee, Abbott summarized the review and selection process, explaining that the search committee was focused on "education (including fit to an M.E. department), research productivity (e.g., number and quality of publications), fit for a 'robotics' search, fit to the existing group (in terms of potential collaboration opportunities with the existing group and/or bringing something new to the existing group), and the quality of teaching and research statements."[44] Abbott's summary provided a ranked list of the top ten candidates.[45] Felt was ranked sixth on this list.[46] Abbott's response also expressed the search committee's belief that "the top seven applicants [were] worthy of a potential invitation for an on-campus interview."[47] Abbott asked Ameel to "start the process to get approval" for the listed candidates, noting that he did not "see any potential problem" with the selected candidates because they were "quite diverse."[48]

Ameel forwarded Abbott's summary to the department manager, Sheila Olson, and asked her to "prepare the form for administration approval" based on the information that Abbott provided.[49] Olson then prepared an initial Faculty Search Update form and submitted it to the office of the Dean for the College of Engineering on February 1, 2018.[50] This form stated that there were three candidates chosen for final interviews but also included a list of five top candidates, with all but the top candidate being designated as "[s]till under consideration for an interview."[51] Below this list was a checkbox indicating that the department intended to interview additional

---

[43] *Id.*
[44] Dkt. No. 49-8 at 4.
[45] *Id.*
[46] *Id.* at 5.
[47] *Id.* at 4.
[48] *Id.* at 3.
[49] *Id.* at 2.
[50] Dkt. No. 49-21 at 2–3.
[51] *Id.* at 4.

candidates, along with a note that "there [were] still three candidates that [the department was] evaluating to fill [its] final slot."[52]

Felt was not included on this initial list of finalists.[53] The top-ranked candidate (designated in the record as "Candidate 1") was identified as a "Caucasian female" and was followed, in ranked order, by a "Caucasian male" ("Candidate 2") and three "Asian male[s]" ("Candidate 3," "Candidate 4," and "Candidate 7").[54] In submitting the initial form, Olson indicated that the department was still conducting preliminary interviews, that it would ultimately "make up [its] mind on the 4 candidates that [it was] still considering," and that Candidate 1 would be brought in for an on-campus interview.[55] Typical practice in the department was to invite three candidates for on-campus interviews.[56]

Later on February 1, 2018, a revised Faculty Search Update form was submitted.[57] This version of the form only listed Candidate 1 as a finalist but also included a filled checkbox indicating that additional candidates would be added to the list.[58] Email correspondence regarding the updated form stated that the initial submission "included additional candidates not yet ready to be approved," and that "Candidate 1 [was] the only approval request" at the time because her

[52] *Id.*
[53] *See id.*
[54] *Id.* at 5.
[55] *See* Dkt. No. 49-20 at 2.
[56] In a deposition, Abbott testified that search committees "typically bring in three" candidates for on-campus interviews, though he acknowledged that "three is not a hard number." Dkt. No. 49-11 at 18. The other members of the search committee offered similar testimony. *See* Dkt. No. 49-5 at 7 (Lenzi: "For one opening, I will say, normally, it's two or three candidates that we invite for in-person interview."); Dkt. No. 49-12 at 22 (Meek describing it as "pretty standard" to "only ask for three" on-campus interviews); Dkt. No. 49-13 at 17 (Mascaro: "[W]e usually like to invite a minimum of three candidates."); Dkt. No. 49-24 at 15 (Merryweather: "[W]e typically only invite three candidates for in-person on-campus interviews from a search.").
[57] Dkt. No. 49-27 at 2–3.
[58] *Id.* at 4. The updated form also retained the initial form's statement that the department was still weighing three candidates for its "final slot." *Id.*

application was "time-sensitive."[59] When deposed on this subject, Abbott stated that "there was a sense that [Candidate 1] was going to be a hot commodity."[60] Accordingly, he explained, the search committee wanted to move quickly on her application to avoid "los[ing] her" to another school.[61]

On February 7, 2018, Olson asked Abbott to provide a further revised Faculty Search Update form to account for any Skype interviews or other developments that had occurred since the first revised form was submitted.[62] In so doing, Olson stated that the department previously "only approved [Candidate 1]—because out of the 4, [Ameel] was not sure about [Candidate 2]."[63] The search committee provided a further revised form, which listed Candidate 1, Candidate 4, Candidate 2, and Candidate 3, ranked in that order, as the individuals selected for on-campus interviews.[64] This list noted that Candidate 1 had already been approved for an on-campus interview.[65] The checkbox below the list indicated that the search committee intended to interview additional candidates, but an accompanying note stated, "[a]s described above, we have three additional candidates that we want to invite for a campus interview."[66] Among other things, the narrative information for the candidates listed on the form indicated that Candidate 1 was

[59] *Id.* at 2.
[60] Dkt. No. 49-11 at 19.
[61] *Id.*
[62] *See* Dkt. No. 49-29 at 2.
[63] *Id.*
[64] Dkt. No. 49-30 at 3.
[65] *Id.*
[66] *Id.*

"[p]ossibly a better fit to the DEMS division . . . but would still strengthen and expand the Robotics group."[67] The University approved the list of candidates on this version of the form.[68]

Ultimately, Candidate 1 canceled her on-campus interview after she accepted a position at another university.[69] In addition, while Candidate 4 completed an on-campus interview, Candidate 3 canceled his on-campus interview in order to pursue positions at locations closer to family members.[70] Candidate 2 eventually had a campus visit that, while structured like "any other two-day interview," was "not officially . . . part of an ongoing search," as it was determined that Candidate 2 "[did] not fit [the] Robotics search" but had potential to be an "opportunity hire," perhaps in the following year.[71]

After Candidate 1 and Candidate 3 canceled their interviews, Mascaro recommended "bringing out another candidate or two," indicating that Candidate 4, though impressive, was not a "sure thing."[72] Mascaro specifically said that "Felt would be next on [his] list of candidates [that he would] like to see."[73] Abbott proposed that the robotics group hold a meeting to discuss next

---

[67] *Id.* at 4. As to Candidate 4, the form noted his "[r]esearch in control and motion planning for legged robot." *Id.* For Candidate 2, the form indicated that he was a "[b]etter fit to the DEMS division" who would "certainly strengthen [the] department" but may not "strengthen the visibility of Robotics at Utah." *Id.* For Candidate 5, the form noted his "[r]esearch in the design and control of mobile robotic systems." *Id.*

[68] *See* Dkt. No. 49-34 at 2.

[69] Dkt. No. 49-4 at 3.

[70] *Id.*; Dkt. No. 49-18 at 12.

[71] Dkt. No. 49-41 at 2–3; Dkt. No. 49-44 at 2–3, 5; *see also* Dkt. No. 49-45 at 5. An "opportunity hire" is someone who, thanks to significant experience and achievements in academia, may be hired through alternative means outside a traditional search. *See* Dkt. No. 49-39 at 31; *see also* Dkt. No. 49-24 at 14.

[72] Dkt. No. 55-5 at 2.

[73] *Id.*

steps for the search.[74] He asked the group to review the applications of Candidate 2, Candidate 5, and Felt ahead of the meeting.[75]

After the ensuing meeting, Abbott sent Ammel an update, which stated that "[t]he (expanded) search committee unanimously [felt] that [Candidate 1, Candidate 3, and Candidate 4] were substantially stronger then [sic] the next-best candidates."[76] The group recommended that the department extend an offer to Candidate 4 "and only consider bringing in additional candidates in the event that [he] declines [the] offer."[77] At department faculty meeting on March 16, 2018, Ameel shared his view that Candidate 4 was the best available candidate, and all voting faculty members agreed to extend an offer to him.[78] Later in March, Ameel began negotiating an offer with Candidate 4.[79]

In the end, Candidate 4 decided to take a position at another university.[80] Candidate 2 advised that he would not be able to accept a position at the University for the time being due to a recent death in his family, but asked to "keep the communication channels open for the future."[81] Based on these developments, Abbott concluded in a June 5 email to the robotics group that the department could either pursue "other targeted hires" or "simply let this search fail."[82] In response, Merryweather questioned whether the group should "tak[e] a closer look at . . . Felt."[83] But another

---

[74] *See* Dkt. No. 49-37 at 2.
[75] *Id.*
[76] Dkt. No. 49-4 at 2–3.
[77] *Id.* at 3.
[78] Dkt. No. 49-42 at 2–3.
[79] Dkt. No. 49-43 at 2.
[80] Dkt. No. 49-46 at 2.
[81] *Id.*
[82] *Id.*
[83] Dkt. No. 49-49 at 2. In his deposition, Merryweather explained that he made this suggestion because Felt "ranked well among all the candidates" and "was very interested in the position." Dkt. No. 49-24 at 9.

faculty member recommended that the group "hold off" on further interviews, noting, among other things that there were no "pressing needs in terms of teaching or other holes that we have to fill immediately."[84] Ultimately, Felt was not invited for an on-campus interview, and the department closed the search on August 1, 2018, without hiring anyone.[85]

A few months later, Felt filed a charge of discrimination against the University with the Utah Antidiscrimination and Labor Department ("UALD"), alleging that the University discriminated against him on the basis of sex, national origin, race, and religion.[86] When the UALD found no cause of discrimination, Felt appealed to the Utah Labor Commission ("ULC"), which ultimately granted a directed verdict in favor of the University.[87] Felt moved the ULC Commissioner for reconsideration, but that request was denied.[88] Felt next asked the U.S. Equal Employment Opportunity Commission (the "EEOC") to review his charge.[89] The EEOC agreed with the findings of the state agencies but issued Felt a notice of right to sue.[90] Felt then initiated the present action in this Court.[91]

In the context of this lawsuit, the members of the search committee have offered their perspectives on the interview process and Felt's qualifications. In his deposition, Abbott testified that Felt's race, sex, and religion were not reasons why the search committee chose not to invite him for an on-campus interview.[92] Abbott acknowledged that the University had "mechanisms" in

---

[84] Dkt. No. 49-46 at 2.
[85] Dkt. No. 49-54 at 2.
[86] Dkt. No. 49-65 at 2; Dkt. No. 49-66 at 2. Felt's initial charge alleged discrimination on the basis of color, but he later amended this charge to allege discrimination on the basis of national origin. Dkt. No. 49-65 at 2; Dkt. No. 49-66 at 2.
[87] *See* Dkt. No. 36-5 at 2–3, 23; Dkt. No. 49-67 at 2.
[88] Dkt. No. 49-68 at 2.
[89] Dkt. No. 26-1 at 2.
[90] *Id.* at 3.
[91] *See* Dkt. No. 26 at 2.
[92] *See* Dkt. No. 49-11 at 35.

place to promote diversity, though he admitted that he "[did not] understand them" and insisted that they were "not part of . . . a faculty search discussion."[93] Abbott indicated that although Felt was no less qualified than candidates who were invited for in-person interviews, the search committee was not "very excited" about his proposed areas of research following his Skype interview.[94] Specifically, Abbott observed that the robotics group had recently hired someone focused on "lower-leg robots, prosthetic legs, [and] leg exoskeletons"—subjects that promised to be the emphasis of Felt's research as well.[95] Abbott was also puzzled by some of Felt's responses during his Skype interview. While the search committee was curious about Felt's postdoctoral work in soft robotics, Abbott explained, Felt seemingly did not want to discuss that work, even though the search committee asked "leading questions" to coax him.[96] Abbott also highlighted concerns about funding for Felt's proposed research, expressing that Felt seemingly did not "know what it takes" to draft grant proposals.[97] As to Candidate 1, however, Abbott felt that she had a "perfect Skype interview" and was "going to be able to get a ton of funding for [her] research."[98]

Like Abbott, Lenzi stated that Felt's race, sex, and religion were not part of the search committee's analysis.[99] Lenzi also testified that, following Felt's Skype interview, the search committee was concerned about Felt's "overlap . . . with other faculty," "naïve" ideas for research, and lack of familiarity with the process for obtaining grant funding.[100] Mascaro, meanwhile, reported that "committee members just weren't excited about [Felt's] research area."[101] But as to

---

[93] *Id.* at 20.
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.* at 28.
[99] Dkt. No. 49-5 at 38.
[100] *Id.* at 13, 30–31.
[101] Dkt. No. 49-13 at 20.

Candidate 1, Mascaro recalled that "she was doing some fairly novel research at the intersection of biology and robotics."[102]

In his deposition, Meek acknowledged the availability of "diversity funding" and recognized that white men had historically "dominated" the engineering field.[103] He assumed that Felt would not have qualified for diversity-related funding but admitted that he did not know how the University allocated such funds.[104] Meek further testified that Felt's particular research area, which Meek described as "soft robotics," including "muscle type of devices with sensors in them," was "kind of interesting, but not that spectacular," and not "something that [the robotics group was] looking for."[105] As to Candidate 1, Meek observed that she "did some very nice work in the medical area[,] which [the robotics group was] really trying to push."[106]

Merryweather recognized in his deposition that diversity was generally "a consideration" for him in faculty searches because "the department [was] interested in diversity," though he clarified that the purpose of this focus on diversity was "to avoid personal biases . . . against candidates from underrepresented groups."[107] At an administrative hearing, Merryweather stated, "diversity, I suppose, is considered when asking for permission to conduct further interviews with candidates that have been identified by a committee," though he did not provide—and counsel did not request—further clarification on this point.[108] Moreover, in his deposition Merryweather said that the search committee did not discuss Felt's race, sex, or religion during its evaluation

---

[102] *Id.* at 15.
[103] Dkt. No. 49-12 at 11.
[104] *Id.*
[105] *Id.* at 24.
[106] *Id.* at 19.
[107] Dkt. No. 49-24 at 13–14.
[108] Dkt. No. 49-6 at 25:55–26:50.

process.[109] He further testified that Candidate 1's diversity characteristics were not part of his evaluation.[110] He also denied feeling any "pressure"—whether within or outside the search committee—to elevate diverse candidates or disfavor white men like Felt.[111] Regarding Felt, Merryweather noted that his grant proposals were "not fully developed."[112] According to Merryweather, Felt also admitted in his Skype interview that he was "not familiar with the system" for attaining grant funding in the United States.[113] This was concerning because in Merryweather's view, "writing grants out of the gate" was a key to success as a faculty member.[114] Candidate 1, on the other hand, "had a lot of training . . . in grant writing," Merryweather said.[115]

## **DISCUSSION**

The University now moves for summary judgment, asserting that Felt has not established a prima facie case of discrimination or demonstrated that the University has offered a pretextual rationale for its decision not to hire him.[116] Summary judgment is appropriate where there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary-judgment stage, the movant bears "both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)). Accomplishing this feat does not

---

[109] Dkt. No. 49-24 at 18, 24–25.
[110] *See id.* at 14.
[111] *Id.* at 14, 27.
[112] *Id.* at 18.
[113] *Id.*; *see also id.* at 15.
[114] *Id.* at 18.
[115] *Id.* at 14.
[116] Dkt. No. 49 at 4. The University has also requested leave to file an overlength reply in support of its motion for summary judgment. Dkt. No. 58 at 1. The Court will grant that request, as it has considered the University's proposed reply in preparing this order.

require the movant to disprove the challenged claim; instead, the movant may simply "point to an absence of evidence to support" the challenged claim. *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). If the movant carries this initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). For summary-judgment purposes, "[a]n issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." *Id.* (quoting *Jenkins*, 81 F.3d at 990). In reviewing the record for genuine and material factual disputes, the Court must consider the evidence "in the light most favorable to the party opposing summary judgment." *Id.* at 1168 (quoting *Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir. 1997)).

Title VII makes it unlawful for an employer to "fail or refuse to hire" on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As is notable here, this prohibition applies even in cases where the plaintiff belongs to a "majority group." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025). To succeed on a claim for disparate treatment under Title VII, a plaintiff must demonstrate that the employer at issue discriminated against him intentionally. *Id.* at 308. There are two ways for a plaintiff to make this required showing. First, a plaintiff may establish intentional discrimination through direct evidence, i.e., "evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1137 (10th Cir. 2024) (alterations adopted) (quoting *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003)). For instance, "an existing policy which itself constitutes discrimination" qualifies as direct evidence. *Id.* (quoting *Heim v. Utah*, 8 F.3d 1541, 1546 (10th Cir. 1993)). Second, a plaintiff may show intentional discrimination through

circumstantial evidence, in which case the familiar framework established in *McDonnell Douglas Corp. v. Green*[117] applies. *McNellis*, 116 F.4th at 1137.

The *McDonnell Douglas* framework has three steps. At the first step, the plaintiff has the burden of establishing "a prima facie case of discrimination," which he may do by showing that "(1) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, (3) [he] qualified for the position at issue, and (4) [he] was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). If the plaintiff makes this showing, the second step in the analysis gives the employer the burden of "produc[ing] a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the employer accomplishes this, then at step three "the burden . . . shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

"Pretext can be inferred from evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation" that could lead a reasonable factfinder to deem "the employer's rationale unworthy of credence." *Walkingstick Dixon v. Oklahoma ex. rel. Reg'l Univ. Sys. of the Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025) (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)). For example, "the use of subjective criteria" may contribute to a finding of pretext. *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984). That said, "the existence of subjective criteria alone is not considered evidence of pretext." *Sellman v. Aviation Training Consulting, LLC*, 155 F.4th 1215, 1225 (10th Cir. 2025) (quoting *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 657 (10th Cir. 2013)). "Indeed, *some* subjectivity is to be expected in every hiring decision." *Conroy v.*

[117] 411 U.S. 792 (1973).

*Vilsack*, 707 F.3d 1163, 1177 (10th Cir. 2013). Indeed, "[a]n employer has discretion to choose among equally qualified candidates, provided that the decision is not based upon unlawful criteria." *Id.* at 1178 (quoting *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981)).

Moreover, for a plaintiff wishing to establish pretext, "[i]t is not enough that a factfinder could disagree with the employer's assessments." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004). Critically, a simple comparison of the plaintiff's qualifications with those of a successful candidate is insufficient to establish pretext unless the plaintiff is "overwhelmingly better qualified." *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993); *see also Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 747 (10th Cir. 1991) ("[A] plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on . . . ."); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (concluding that a discharged plaintiff's contention that "she was *in fact* equally or more qualified than" an employee who was not discharged was "insufficient to support a finding of pretext").

As an initial matter, Felt has not presented direct evidence of discrimination. Felt asserts that the FHI was a facially discriminatory policy, but the Court disagrees. The FHI provided potential funding when candidates from underrepresented groups were hired, but departments were still counseled to hire the best candidate regardless of protected characteristics, and funding was never guaranteed.[118] In addition, candidates themselves did not receive FHI funding based on protected characteristics, as the funds could not be used to increase a salary offer.[119] Felt theorizes that decisionmakers could have used the FHI to artificially elevate candidates from diverse backgrounds, but in making this argument, Felt asks the Court to draw an inference about specific

---

[118] *See* Dkt. No. 49-60 at 4, 13, 21; Dkt. No. 55-8 at 2–3.
[119] *See* Dkt. No. 49-60 at 10–11.

applications of the FHI, and that is not appropriate at this stage of the analysis where Felt is purportedly relying on *direct* evidence. *See McNellis*, 116 F.4th at 1137. Felt cites *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,[120] but he does not elaborate on how this decision affects the analysis here.[121] The Court need not respond to arguments that Felt himself does not make, but in the interest of thoroughness, the Court will note that *Students for Fair Admissions* was a Fourteenth Amendment case about college admissions, not a Title VII case. *See* 600 U.S. at 190-91. More importantly, the evaluation processes at issue in that case either allowed or required decisionmakers to consider an applicant's race when making admissions decisions and made race "a determinative tip" for some students. *Id.* at 194–97 (quoting 397 F. Supp. 3d 126, 178 (D. Mass. 2019)). That is quite different from the process at issue here, where departments were simply instructed to hire the most qualified person for the job and a benefit of additional funding was *potentially* available on the back end for diverse candidates, though not for the candidates themselves. Thus, Felt has not produced direct evidence of discrimination.

Because Felt has no direct evidence of discrimination, he must rely on the three-step *McDonnell Douglas* framework. For the sake of brevity, the Court will assume without deciding that Felt can make out a prima facie case of discrimination. Even with this generous framing, though, Felt's discrimination claims fail. The University has brought forward a legitimate, nondiscriminatory reason for failing to hire Felt, asserting that the search committee was "not excited" about Felt's candidacy, which made it preferrable to close the search and try to find a suitable candidate later.[122] Critically, Felt has not shown that this rationale is pretextual.

---

[120] 600 U.S. 181 (2023).
[121] Dkt. No. 55 at 34.
[122] Dkt. No. 49 at 28–29.

Felt asserts that the University was, or at least should have been, excited about his candidacy because of his focus on soft robotics, which was mentioned as one of the subject areas being targeted in the search. But Abbott testified that Felt seemed uninterested in speaking about his soft robotics work in his Skype interview, even though he was given a chance to do so. Moreover, multiple members of the search committee expressed concern that Felt's research would overlap with existing projects in the robotics group. True, Abbott once noted that Felt would be a "[g]ood fit for [the] group," but this observation was made during the search committee's initial review of applications.[123] It was the subsequent Skype interview that caused the committee's concerns.

Felt's next attempt to establish pretext focuses on Candidate 1's qualifications. He suggests that her candidacy was elevated on the basis of sex because she was ranked ahead of him despite being "a better fit to the DEMS division."[124] This argument does not tell the whole story. While the search committee felt that the DEMS division would be a good spot for Candidate 1, they also agreed that she "would still strengthen and expand the Robotics group."[125] Moreover, while Abbott declined to say that Felt was less qualified than Candidate 1, he and the other members of the search committee made it clear that they were more interested in Candidate 1 because she had cutting-edge research proposals that fit the needs of the robotics group and displayed greater potential to write and secure research grants.

Felt further complains that the University's asserted nondiscriminatory rationale is "subjective."[126] But every hiring process involves subjective judgment to some extent or another.

---

[123] Dkt. No. 49-14 at 2.
[124] Dkt. No. 49-30 at 4.
[125] *Id.*
[126] Dkt. No. 55 at 42.

*Conroy*, 707 F.3d at 1177. What matters is whether an employer's subjective evaluation is merely cover for the unlawful consideration of protected characteristics, *see id.* at 1178, and Felt has not shown that to be the case here. Based on the record, the decision not to invite Felt for an on-campus interview was not a result of any arbitrary factor, let alone his race, sex, religion, or national origin. Indeed, the members of the search committee all cited concerning professional deficiencies—underdeveloped, uninspiring, or impractical research ideas, lack of familiarity with funding mechanisms, etc.—when addressing why Felt was not invited for an on-campus interview.[127]

Felt contends that he should have been invited for an on-campus interview because he was among the top five candidates after his Skype interview, but only four—seemingly more candidates than usual—were designated for in-person interviews.[128] Felt insists that he was "worthy" of an on-campus interview based on Abbott's email correspondence with Ameel, but the applicable message merely states that Felt, along with others, was "worthy of a *potential* invitation for an on-campus interview."[129]

Felt also makes much of the fact that only one candidate ultimately had an on-campus interview,[130] but the University did not plan in out that way. Again, four candidates were designated for on-campus interviews, but some of those interviews were canceled due to circumstances beyond the University's control.[131] Felt asserts that he should have been invited on campus once other top candidates dropped out because the checkboxes on the Faculty Search Update forms

---

[127] *See* Dkt. No. 49-5 at 13, 30–31; Dkt. No. 49-11 at 20; Dkt. No. 49-12 at 24; Dkt. No. 49-13 at 20; Dkt. No. 49-24 at 14–15, 18.
[128] *See* Dkt. No. 49-5 at 7; Dkt. No. 49-11 at 18; Dkt. No. 49-12 at 22; Dkt. No. 49-13 at 17; Dkt. No. 49-20 at 2; Dkt. No. 49-24 at 15; Dkt. No. 49-30 at 3.
[129] Dkt. No. 49-8 at 4 (emphasis added).
[130] In particular, Felt latches onto Mascaro's testimony that having only one on-campus interview is something that "never" happens in an open search. Dkt. No. 49-13 at 12–13.
[131] *See* Dkt. No. 49-4 at 3; Dkt. No. 49-18 at 12.

suggested that the department would send out more invitations.[132] These forms were not etched in stone, however. Indeed, the very checkbox that Felt points to shows that Faculty Search Update forms may be, well, updated. Moreover, the record shows that the decision not to extend more interview invitations was the product of a thoughtful process that included feedback from the broader mechanical engineering department and led to the conclusion that closing the search was the best option, in part, because Candidate 1, Candidate 3, and Candidate 4, all of whom chose to pursue positions elsewhere, were clearly the best applicants in the pool.[133] Thus, the decision not to hold additional on-campus interviews is not evidence of pretext.

Moreover, while Felt argues that Candidate 1 received "special treatment in the search process,"[134] the record does not support that notion. True, she was the only candidate listed on one Faculty Search Update, but that is because the search committee wanted to move quickly on her application while still considering other candidates.[135] This Faculty Search Update was not a final determination—the search committee clearly intended to extend additional interview invitations, and other candidates were ultimately given the opportunity to interview on campus just like Candidate 1.[136]

Finally, Felt insists that the search committee, despite much testimony to the contrary, improperly considered protected characteristics during the search process. The evidentiary support for this argument is flimsy. While Merryweather acknowledged taking diversity into account in faculty searches, he went on to say that diversity was emphasized in order to guard against

[132] *See* Dkt. No. 55 at 42.
[133] *See* Dkt. No. 49-4 at 2–3; Dkt. No. 49-37 at 2; Dkt. No. 49-42 at 2–3; Dkt. No. 49-46 at 2; Dkt. No. 49-49 at 2; Dkt. No. 55-5 at 2.
[134] Dkt. No. 55 at 42.
[135] *See* Dkt. No. 49-11 at 19; Dkt. No. 49-27 at 2; Dkt. No. 49-29 at 2.
[136] *See* Dkt. No. 49-27 at 2, 4; Dkt. No. 49-30 at 3.

improper biases.[137] At no point did he suggest that he artificially elevated one candidate over another based on protected characteristics. Felt also points to Merryweather's statement from the administrative hearing, but that statement is not the damning admission that Felt makes it out to be. Merryweather stated that "diversity . . . is considered when asking for permission to conduct further interviews with candidates that have been identified by a committee."[138] Considered by whom? And in what sense? Felt does not offer satisfactory answers to these questions. He posits that the search committee took diversity into account when submitting names for on-campus interviews, but Merryweather himself indicated that Felt's protected characteristics were not part of the search committee's discussions and that there was no pressure from inside or outside the search committee to select diverse applicants.[139]

Thus, Felt has not produced direct evidence of discrimination and has failed to show that the University's proffered nondiscriminatory rationale is pretext. Therefore, the University is entitled to summary judgment.

**ORDER**

Based on the foregoing, the University's motion for summary judgment (Dkt. No. 49) is GRANTED. The University's related motion for overlength briefing (Dkt. No. 58) is likewise GRANTED.

DATED this 29th day of September 2026.

BY THE COURT:

Ann Marie McIff Allen
United States District Judge

[137] Dkt. No. 49-24 at 13–14.
[138] Dkt. No. 49-6, at 25:55–26:50.
[139] Dkt. No. 49-24 at 14, 18, 24–25, 27.